## STATE OF MISSOURI

AT THE

APRIL TERM, 1923.

---

(*Continued from Volume* 300).

---

THE STATE ex rel. PENROSE INVESTMENT COM-
PANY et al. v. JAMES N. McKELVEY.

In Banc, October 6, 1923.

1. **CITIES: Police Powers: Zoning Ordinance.** A city has no power
to enact, as a police regulation, an ordinance dividing the city into
residence, commercial, industrial and unrestricted districts and
preventing the owner of a lot in a residence district from erecting
an electrically-driven ice manufactory thereon, without compensa-
tion for the damage resulting from the restriction.

*Held*, by WALKER, J., with whom WOODSON, C. J., and DAVID
E. BLAIR, J., concur, that an ordinance which prevents the
owner of a lot from constructing an electrically-driven ice-
manufacturing plant thereon is not embraced in charter pro-
visions authorizing the city to prohibit, abate and suppress
all business, occupations and uses of property detrimental to
the health, morals, comfort, safety, convenience or welfare
of the inhabitants of the city and all nuisances and causes
thereof, and to prescribe limits within which business, occupa-
tions and practices liable to become nuisances or detrimental to
the health, security or general welfare of the people may be
established, conducted or maintained, because such an ice

301 Mo.]

manufactory, though situated in a congested residential district, is not a nuisance and is not detrimental to the public health, morals, safety or material welfare.

*Held*, by GRAVES, J., concurring in the result, that a zoning ordinance, which prevents the subsequent establishment of manufacturing plants in residence districts, is the devotion of private property to a public purpose, at least to the extent that the property is damaged by such restriction, and unless it provides for just compensation the city has no constitutional authority to enact it.

*Held*, by WHITE, J., dissenting, with whom JAMES T. BLAIR and RAGLAND, JJ., concur, that such charter provisions are comprehensive enough to embrace a reasonable zoning ordinance; that the police power expands and enlarges to meet the increased dangers to the public health, safety and general welfare produced by the congestion and density of populations of large cities and the industrial complexities of modern society; that manufacturing plants produce unsightly surroundings, disagreeable odors, disturbing noises, congested traffic and overcrowded areas, multiply casualties and inconveniences and render residences in their neighborhood uninhabitable, all of which directly affect the public health, safety and general welfare, of all of which courts take judicial notice; and a fair ordinance preventing their future establishment within a designated residence district is a reasonable police regulation.

2. **ZONING ORDINANCE: Police Regulation: Eminent Domain: Distinction: Infringement on Rights of Private Property: Unconstitutional Ordinance.**

*Held*, by WALKER, J., with whom WOODSON, C. J., and DAVID E. BLAIR, J., concur, that the police power extends to the protection of the public, and may be employed to prevent the use of private property in such a way as to injure the public health, safety, morals or general welfare, and its exercise does not imply compensation to the owner for its decreased value due to the restricted use, and in consequence it cannot be employed unless the restricted use is necessary and essential to the public health, safety, morals or material welfare; eminent domain is the power to take private property for a public use or enjoyment, and just compensation is a prerequisite to its exercise. The effect of a police regulation is to restrict a property right as harmful to the public; the effect of condemnation is to appropriate a property right because it is useful to the public. A zoning ordinance, which divides a city into residence, industrial, commercial and unrestricted districts and prevents the owner of a lot in the residence

State ex rel. Penrose Investment Co. v. McKelvey.

district from constructing an electrically-driven ice manufacturing plant thereon, without providing any compensation for the restricted use, is not an exercise of either power, and is therefore void.

*Held*, by GRAVES, J., with whom WOODSON, C. J., and DAVID E. BLAIR and WALKER, JJ., concur, that eminent domain in ultimate analysis is but a limited use of the inherent police power; that the value of property is dependent upon the uses to which it may be put, and private property can neither be taken nor damaged without just compensation; that to limit the use of private property is to impose a restriction upon the right of property, which cannot be made without just compensation, and cannot be made under the guise of a police regulation, so long as the use is not harmful to the public; that while a city has a right to enact a reasonable zoning ordinance, preventing the owner of a lot in a residence district from constructing a manufacturing plant thereon, it cannot enact such an ordinance without providing for just compensation for its decreased value caused by such restriction and for a judicial hearing on the amount of damages, unless the right thus restricted would, if exercised, rise to the plane of a public nuisance. *Held*, also, that city zoning is a public purpose and a public use; and where an attempt is made to take or damage private property for an alleged public use, the question whether the contemplated use be really public is for the courts to determine, irrespective of legislative expression on the subject.

*Held*, by WHITE, J., dissenting, with whom JAMES T. BLAIR and RAGLAND, JJ., concur, that, even admitting that a zoning ordinance is the damaging of private property for a public use, the damages are common to all owners of lots in a residence district, and are not special or peculiar to the owner of one lot, and when such is the case it is the universal rule that the lessened value of the one lot caused by the restriction is not included in the term "damages;" that the damages to the many owners of homes in the residence district should have equally as great weight as the lessened value to one lot caused by its prevented use for a manufacturing plant; that the return in this case specifically alleges that the construction of such a plant would deprive the owners of other lots of the full use of them for residence purposes, and would transform the neighborhood into a manufacturing district, and alleges other facts authorizing the legal conclusion that said plant would constitute a nuisance to all residents and property owners in the neighborhood, and these allegations are not denied in the reply, and must

therefore be taken as true, and consequently if relators are entitled to damages, so is every other person who is prevented by a police regulation from devoting his property to a use that is hurtful to the public health, safety and general welfare; that the provisions of the Constitution relating to eminent domain and just compensation do not affect the power to establish reasonable regulations to secure the public health, safety, convenience and the rights of property, and a proper zoning ordinance, designed to secure owners in the use and enjoyment of their homes for themselves and their families and to protect from ruinous depreciation the value of such homes, and to protect such homes from all the objectionable things that render uninhabitable residences in a manufacturing neighborhood, is such a regulation.

## *Mandamus.*

PEREMPTORY WRIT AWARDED.

*Foristel & Eagleton* and *Frank X. Hiemenz* for relators.

(1) The ordinance set forth in respondent's return is invalid, in that, it violates the Constitution of the United States and of this State. Article V of U. S. Constitution (5 Amdt.) sec. 1; Fourteenth Amendment, U. S. Constitution; Secs. 21 and 30, art. 2, Mo. Constitution; St. Louis v. Dreisoerner, 243 Mo. 217; St. Louis v. Dorr, 145 Mo. 466; St. Louis v. Hill, 116 Mo. 527; River Rendering Co. v. Behr, 77 Mo. 91; Ex parte Lerner, 218 S. W. 331; Buchanan v. Wooley, 245 U. S. 60. (2) Depriving an owner of the use of his real property or arbitrarily restricting or limiting the use thereof without adequate compensation is a deprivation of property without due process of law, and while none of relators' property was actually taken the limitations and restrictions placed thereon by the ordinance deprive them of the right to use it for any lawful purpose, and amounts to a taking thereof contrary to Articles V and XIV, U. S. Constitution, and Secs. 21 and 30, art. 2, Mo. Constitution. Haller Sign Works v. Training School, 249 Ill.

436.   (3)   The ordinance is unreasonable, arbitrary, harsh and oppressive and is not of uniform application throughout the city of St. Louis and for that reason is invalid.   Ex parte Lerner, 218 S. W. 331.   (4)   The enactment of the ordinance is not within the charter powers of the city of St. Louis; its power on this subject is granted and limited in and by, Secs. 25-36 and 34 of the charter; St. Louis v. Atlantic Quarry & Const. Co., 244 Mo. 479.   (5)   The ordinance is not a bona-fide regulation of the peace, health, safety and welfare of the inhabitants of the city, nor can its enactment be sustained as a regulation for peace and good order in society.   St. Louis v. Dreisoerner, 243 Mo. 217; St. Louis Gunning Co. v. City, 235 Mo. 99; St. Louis v. Packing Co., 141 Mo. 375.   (6)   It is fundamentally based on aesthetic reasons; it seeks to limit and deprive the owner of the use of real property that in law amounts to a taking or damaging thereof without provision for ascertaining or making compensation therefor; it bears no relation whatever to a municipal by-law enacted under the police power for the health, welfare or safety of the inhabitants of the city and is therefore invalid.   St. Louis v. Dreisoerner, 243 Mo. 217; St. Louis Gunning Co. v. St. Louis, 235 Mo. 99; Haller Sign Works v. Training School, 249 Ill. 436.   (7)   Its object is not in anywise to enlarge the law of public or private nuisance, nor by its terms does it purport to regulate public or private nuisances, or to abate, suppress or prevent their coming into existence, but, on the contrary, by its terms attempts to limit and regulate the use of all real property in the city, in divers ways and means without regard to the use of which said property can be put, and irrespective of whether the use thereof be proper or legal, or whether the use thereof constitutes a nuisance or otherwise, and all of this under the guise of the police power, the essential elements of which are wholly lacking; and without any reasonable basis or reason therefor whatsoever, and in so doing exceeds its charter powers.   Secs. 25, 26 and 34,

Charter of St. Louis. (8)   The Legislature of a state (in this case the Municipal Assembly of St. Louis) cannot constitutionally under color of preventing public or private mischief, or under the guise of the police power, prescribe the kind of improvements the owner of land shall or shall not make, and in what part of the city he may or may not make them, for the toleration of such power on the part of the government would concede to it the right to control every man, and point out to him the road he shall travel in the pursuit of happiness. Gunning Co. v. St. Louis, .235 Mo. 99; People ex rel. v. Chicago, 261 Ill. 16; Chicago v. Gunning System, 214 Ill. 628; Buffalo v. Kellner, 153 N. Y. Supp. 472; St. Louis v. Dreisoerner, 243 Mo. 217.

*George F. Haid* and *Oliver Senti* for respondent; *Glendy B. Arnold, amicus curiae.*

(1)   The city of St. Louis derives its charter in pursuance of the provisions of the Constitution of Missouri, and the police powers delegated therein are conferred by the State upon the city. St. Louis Gunning Co. v. St. Louis, 235 Mo. 149; St. Louis v. Liessing, 190 Mo. 480. (2)   The "zoning" ordinance in question is within the charter powers of the city. St. Louis Gunning Co. v. St. Louis, 235 Mo. 148; Charter of St. Louis, art. 1, secs. 25, 26, 35. (3)   The police power extends to all matters affecting the peace, order, health, morals, convenience, comfort and safety of its citizens. Noble State Bank v. Haskell, 219 U. S. 111; Moses v. United States, 16 App. D. C. 428, 50 L. R. A. 536; State v. Railroad, 242 Mo. 355; Kidd v. Pearson, 128 U. S. 26; C. B. & Q. Ry. Co. v. Drainage Commrs., 200 U. S. 592; Escanaba Co. v. Chicago, 107 U. S. 683; Bacon v. Walker, 204 U. S. 317; St. Louis Gunning Co. v. St Louis, 235 Mo. 148; Slaughter House Cases, 16 Wall. 62; Barbier v. Connolly, 113 U. S. 31; Des Moines v. Manhattan Oil Co., 184 N. W. 826; Reinman v. Little Rock, 237 U. S. 176. (4)

Prima facie, the Municipal Assembly is the sole judge of the necessity for an ordinance, and if reasonable on its face the ordinance will be sustained, unless facts are shown which make it unreasonable.  St. Louis v. Theatre Co., 202 Mo. 699; St. Louis Gunning Co. v. St. Louis, 235 Mo. 201; Cusack Co. v. Chicago, 242 U. S. 531; Ex parte Quong Wo, 118 Pac. 714.  (5)  The party attacking the validity of an ordinance upon the ground of unreasonableness has the burden of showing unreasonableness.  St. Louis v. Theatre Co., 202 Mo. 700; Wagner v. St. Louis, 224 S. W. 413, 12 A. L. R. 495; State v. Addington, 77 Mo. 118; Des Moines v. Manhattan Oil Co., 184 N. W. 829.  (6)  The zoning ordinance in question is reasonable and does not violate any of the provisions of the Constitution of Missouri, and is a valid exercise of the police power by the Municipal Assembly.  Hadacheck v. Los Angeles, 239 U. S. 394; In re Opinion of Justices, 127 N. E. (Mass.) 525; Lincoln Trust Co. v. Williams Building Corp., 229 N. Y. 313; Reinman v. Little Rock, 237 U. S. 171; Biggs v. Steinway & Sons, 229 N. Y. 320; Ex parte Quong Wo, 118 Pac. 714; Ex parte Montgomery, 125 Pac. 1070; Boyd v. Sierra Madre, 183 Pac. 230; Welch v. Swasey, 79 N. E. (Mass.) 745; Cochran v. Preston, 108 Md. 220; State ex rel. v. Cunningham, 97 Ohio St. 130; Salt Lake City v. Western Foundry Works, 187 Pac. (Utah) 829.  (7)  The fact that aesthetic considerations may enter into the reasons for the passage of an ordinance of the character in question does not invalidate the ordinance.  St. Louis Poster Adv. Co. v. St. Louis, 249 U. S. 269; Welch v. Swasey, 214 U. S. 91; State ex rel. v. Houghton, 144 Minn. 13.  (8)  A proper exercise of the police power does not constitute the taking of property for public use without compensation, although its exercise may interfere with the full enjoyment of the property.  1 Dillon on Municipal Corp. (5 Ed.) sec. 301, p. 555; St. Louis Gunning Co. v. St. Louis, 235 Mo. 171; Eichenlaub v. St. Joseph, 113 Mo. 404; Knox

v. Lee, 12 Wall. 551; St. Louis v. Galt, 179 Mo. 16; Munn v. Illinois, 94 U. S. 125; State ex inf. v. Standard Oil Co., 218 Mo. 383; Des Moines v. Manhattan Oil Co., 184 N. W. 828. (9) The limitations as to use of property under the ordinance in question do not infringe upon the provisions of the Fourteenth Amendment of the Constitution of the United States. Barbier v. Connolly, 113 U. S. 31; C. B. & Q. Ry. Co. v. Drain. Commrs., 200 U. S. 593; Cusack Co. v. Chicago, 242 U. S. 530; Reinman v. Little Rock, 237 U. S. 177.

*John B. Pew, E. F. Halstead, Edwin C. Meservey* and *James E. Goodrich, amici curiae,* on motion for rehearing.

(1) From a careful reading of the various opinions in these cases we feel that the question causing the greatest diversity of opinion is this: Do the restrictions imposed by the ordinance constitute a taking of property without compensation? In an orderly consideration of the foregoing question we should first determine exactly what is embraced within the term "properly," as the word is used in its constitutional sense. In conformity with the past rulings of this court, we believe that all will agree upon the following fundamental propositions: (a) By the term property is meant, not the tangible, physical thing, but the right to use or exercise dominion over the thing. 22 R. C. L. 37; St. Louis v. Hill, 116 Mo. 533. (b) That this right to use or exercise dominion over the thing is limited to those uses and those acts of dominion which are not injurious to others or to the community. 22 R. C. L. 39. From the two foregoing propositions, which are so elemental that we will not at this time burden the court with citation of other authorities, it necessarily follows: (c) That "property," as used in the Constitution, does not include those uses or acts of dominion which are injurious to others or to the community. And since those uses and acts of dominion which are injurious to others or to the community are

not property, and are not property rights, it also necessarily follows:   (d)   That a police regulation, restraining or restricting those uses or acts of dominion which are injurious to others or to the community, does not constitute a taking of property within its constitutional meaning.   22 R. C. L. 40, 41.   (2)   Under numerous decisions heretofore cited in those cases, it may be conceded that by the words ''injurous to others or to the community'' is meant those uses and acts of dominion which are injurious or detrimental to the public health, safety, morals, comfort, conveninence, prosperity or general welfare.   We believe that it will stand admitted by all:   (a)   That the natural tendency of an invasion of a quiet, clean district of residences (whether it be a district of mansions or cottages) by apartments, hotels, retail stores or factories, is to bring about a marked depression of property values in such district; that the natural tendency of such invasion is to destroy the comfort, quiet, cleanliness and restfulness of such district; that the natural tendency of such invasion is to cause an exodus of the home owners of such district, followed by a condition of landlordism and tenantry resulting generally in a neglected, run-down district with original values practically wiped out; and that the natural tendency of such an invasion (varying in degree with the character and extent of the invasion) is toward the destruction of the healthful, wholesome, moral surroundings which should safeguard home and family life, and the rearing of children.   It is a matter of common knowledge that practically all the large cities of the country contain large areas of blighted district where business and industry have invaded residence districts which were naturally suited for residence purposes, and not for business or industrial purposes.   As a result, these districts are now ruined for residence purposes, and practically unused for business and industry.   (b)   It is a matter of common knowledge that this shifting of uses and districts has cost the public millions of dollars in

useless expenses in rearranging public improvements and public utility service to take care of demands that would have been avoided by a stabilization of uses and use districts. (c) Zoning laws do not tend to destroy this economic and natural development; on the contrary, their purpose is to secure and stabilize such development, and at the same time give protection to the beneficial uses of property, and the general welfare of the community. (d) The question of cheap transportation is one of the most serious problems confronting large cities. Such large areas of near in property have been invaded by scattered business and industrial uses that a general exodus of home owners to the far out districts has resulted. (3) All will concede that an invasion of a residence district by apartments, hotels, business and industry is, as a matter of plain fact and common knowledge, usually and naturally attended by all or some of the evils pointed out above. If such concession be made, then follows the final proposition, as follows: Are these evils such evils as are detrimental to the public health, safety, morals, comfort, convenience, prosperity or general welfare? The answer to this proposition is so plain that the question almost answers itself. Who will contend that crowded traffic laden streets, contaminated atmosphere, increased fire hazards, decreased efficiency of fire fighting apparatus, overtaxed water mains, overtaxed sewers, increased dirt, smoke and germ laden dust, and the erection of huge buildings cutting off light and air is not detrimental to the health and safety of all persons, and particularly to the children and the old and infirm living in a district so affected? (4) From a consideration of all the indispensable facts and legal principles heretofore discussed, the general summing up must be as follows: (a) Our Constitution prohibits the taking of private property without compensation. (b) "Property" as used in the constitutional prohibition is not the physical thing, but is the right to make such uses and to exercise such acts of dominion over the thing as are not

detrimental to the public health, safety, morals, comfort, convenience, prosperity or general welfare.  (c) The invasion of a residence district by apartments, hotels, business places and factories is, in its natural tendency, an evil which is detrimental to the public health, safety, morals, comfort, convenience, prosperity and general welfare.  (d)  It therefore follows that the act of the State in remedying this evil by restricting and restraining those uses and acts of dominion which are detrimental to the public health, safety, morals, comfort, convenience, property and general welfare, does not amount to a taking of property.  Hibbard v. Halliday, 158 Pac. 1158, L. R. A. 1916F, 903.  (5)  None of the courts which uphold the validity of zoning laws have done so upon the theory that the evils sought to be remedied are public nuisances.  On the contrary, as in the case of Des Moines v. Manhattan Oil Co., 184 N. W. 823, the court enters an express disclaimer of resting its decision upon the ground of nuisance.

WALKER, J.—This is an original proceeding brought by the State at the relation of the corporation named and another against the respondent as Building Commissioner of the City of St. Louis to require him to issue to relators a permit under an ordinance of said city for the erection on a lot belonging to relator of a building in which it is contemplated to install and conduct an electrically-driven ice manufactory.  A compliance with the ordinances of the city other than that designated as the Zoning Ordinance, No. 30,199, approved July 15, 1918, and the observance of other formal requirements requisite to the granting of a building permit, are alleged to have been made, despite which the respondent has refused to authorize the erection of the building.                                              .

Respondent in his return admits all of the facts set forth in the alternative writ, except a compliance with the Zoning Ordinance, particularly, sections 2, 3, 6, 7

and 29 of same, a failure to cómply with which he assigns as the sole reason for his refusal; that under said sections the erection of the proposed building at the location designated for the purpose stated is forbidden by said ordinance, and he is therefore unauthorized to issue said permit.

To this return relators reply that the Zoning Ordinance is void as in violation of Article V (5th Amdt.) and Section I, Article XIV (14th Amendment) of the Constitution of the United States, and of Sections 21 and 30, Article II, of the Constitution of this State; and that it is arbitrary, unreasonable, oppressive and not uniform in its application throughout the city of St. Louis; and hence invalid, and that the business proposed to be conducted in said building will not constitute a nuisance either *per se* or potential; that the city block, No. 2485, on which it is proposed to erect said building is, under said Zoning Ordinance dividing said city, partly in a residential and partly in a commercial district, in that lots numbered 1 to 7, both inclusive, of said block, and certain other property lying to the north, south and west thereof, are classified as a part of the Second Residential District, and that lots 18 to 24, both inclusive, as well as other adjacent property, are classified as belonging to the Commercial District. That the sections of the Zoning Ordinance, No. 30,199, heretofore enumerated and relevant under their terms to the matter at issue, are as follows:

"Section Two. In order to designate, regulate and restrict the location and locations of commerce, business, trades and industries and the location of all buildings designed or occupied for specified uses, the city of St. Louis is hereby divided into five districts, which shall be known as: (a) first residence district; (b) second residence district; (c) commercial district; (d) industrial district; and (e) unrestricted district. The city of St. Louis is hereby divided into the five classes of districts aforesaid and the boundaries of the districts are shown

upon the map attached hereto and made a part of this ordinance, being designated as 'Use Zone Map,' and said map and all the notations, references and other things shown thereon shall be as much a part of this ordinance as if the matters and things set forth by said map were all fully described herein.

"Section Three.   Except as hereinafter provided, the use or uses of all buildings and premises existing at the time of the adoption of this ordinance may be continued.   Except as hereinafter provided, no building now existing and no building hereafter erected shall be occupied, or altered for occupancy, for a specified use in a district restricted against such use, as shown on the map hereinabove mentioned.

"Section Six.   All lands and buildings in the second residence districts, except as hereinafter provided, shall be erected for and used exclusively as dwellings, tenements, hotels, lodging or boarding houses, churches, private clubs, hospitals or sanitariums, public or semi-public institutions of an educational, philanthropic or eleemosynary nature, railroad passenger station and the usual accessories located on the same lot or plot with these various buildings, including the office of a physician, dentist or other person authorized by law to practice medicine, and including private garage containing space for not more than four automobiles; provided, however, that no tenement, hotel, lodging or boarding house shall hereafter be erected, maintained or conducted except as provided in section three of this ordinance in any second residence district occupied exclusively by one and two-family residences, without the unanimous consent of the Board of Public Service after public hearing, duly advertised, has been held thereon. Farming, truck gardening, nurseries or greenhouses may be erected and maintained in second residence districts.

"Section Seven.   All land and buildings in commercial districts as shown upon the map hereinabove mentioned shall be erected for and used as a store or shop

for the conduct of a wholesale or retail business, a place of amusement, an office or offices, police or fire department station house, post office, studios, conservatories, dancing academies, carpenter shop, cleaning and dying works, painting, paper hanging and decorating store, dressmaker, laundry, millinery store, photograph gallery, plumbing shop, roofing or plastering establishment, tailor, tinsmith, undertaker, upholsterer and other similar enterprises or institutions, and also any provided, however, that no building shall have more than fifty per cent of the floor area devoted to industry or storage purposes incidental to its primary use, and provided that not more than five employees shall be engaged in any trade or industry which shall be incidental or essential to the primary use. A telephone exchange, electric substation, or car barn may be established in the commerical district upon permit being issued therefor by the Board of Public Service where such a structure will not be detrimental to or tend to change the character of the neighborhood. In a commercial district a garage containing space for more than four automobiles may be established, erected or enlarged, provided that before permit for such garage is issued by the Board of Public Service there be on file with said Board of Public Service the written consent of the owners of seventy-five per cent of (a) the property within the block where it is proposed to establish, erect or enlarge such garage; or (b) any other property within two hundred feet of the proposed establishment and not separated therefrom by a street. In computing the area of consents required under this regulation so much of the property as is used as garages or stables shall be counted as consenting.

"Section Twenty-nine. The City Plan Commission may of its own initiative or upon petition duly signed and acknowledged by the owners of fifty per cent of the property in any given district or part thereof, cause to be prepared and introduced an ordinance altering the

height, area or use restrictions herewith or subsequently established for such district or part thereof as may be deemed affected by such change. Appeal from the decision of the City Plan Commission on all petitions may be taken to the Board of Public Service.''

I. Statements of counsel and exhibits filed are of a nature to challenge the correctness of the action of the City Plan Commission in the classification of the district in which it is proposed to erect the building in question, as a ''second residence district'' rather than a commercial one. With that contention, however, we are not concerned in the determination of the matter at issue. The vexing question as submitted by the contesting parties is not the legal propriety of the act of the commission, which would involve an admission of its power to act, but whether or not the Zoning Ordinance conferred power on the commission to act in the manner here shown; or in other words, is the ordinance valid in that it constitutes such an exercise of the police power as will sustain the limitation therein prescribed in regard to the use of private property by the owner of same? It is pertinent, although perhaps elementary, to say that the power here sought to be exercised by the city is to regulate the mode of living of the inhabitants, and thus viewed from a sociological vantage, to provide for their health, comfort and welfare. This right, so far as the matter in controversy is concerned, is primarily classified as the police power or that of eminent domain. We took occasion in the dissenting opinion in In re Kansas City Ordinance No. 39946; Kansas City v. Liebi, 298 Mo. l. c. 691, 252 S. W. l. c. 413, to define with care the distinctive differences, so far as determinable from cases and texts, between these two powers. It will suffice here, therefore, to say that the police power may be defined as extending to the protection of the public health, morals and safety and to the promotion of the general welfare (C. B. & Q. Ry. Co. v. People, 200 U. S. 561; Beer Co. v. Mass., 97 U. S. 25;  Thayer's Legal Essays, p. 27, note

1); while that of eminent domain extends to the taking from the owner of property or an easement therein and applying it to a public use or enjoyment—compensation to the owner being a constitutional prerequisite to the exercise of this power. [Art. 2, sec. 21, Mo. Const.; Bridge Co. v. Stone, 174 Mo. 1; Meyers v. Williams, 199 Mo. App. 21; McGrew v. Pav. Co., 247 Mo. 549.] A further distinguishing feature is that the effect of the police power is to restrict a property right as harmful, while that of eminent domain is to appropriate a property right because it is useful. [Comm. v. Alger, 7 Cush. (Mass.) 1. c. 86; Mugler v. Kansas, 123 U. S. 623.] The exercise of either of these powers is not dependent upon a constitutional delegation therefor, but may be said to underlie the same and to rest upon necessity as an essential to the effective conduct of the government. As has been tersely said (Bridge Co. v. Stone, 174 Mo. 1, and People v. Adirondack Ry. Co., 160 N. Y. 225) this power "exists as a necessary attribute of sovereignty." While, as stated, it is not due to any declaration of the organic law, experience has demonstrated the wisdom of placing restrictions upon its use in the National and State constitutions (XIV. Amdt. Const. U. S.; Secs. 21 and 30, Art. 2, Const. Mo.), that those charged with the conduct of public affairs may not in disregard of the rights of the individual render the government despotic. It is rather to the extent of these restrictions than the inherent scope of the power that we should look in determining whether it has been properly exercised. Since the object of this ordinance is ostensibly to promote the general welfare it may be classified, if found to be authorized, as within the purview of the police power.

The charter provisions (Article I, City Charter 1914, p. 540) having their origin in the police power delegated by the State to the city (State ex rel. v. Mer. Ex., 269 Mo. 346) and which are applicable to the matter at issue, are as follows:

"Sec. 25. To define and prohibit, abate, suppress, and prevent or license and regulate all acts, practices, conduct, business, occupations, callings, trades, uses of property, and all other things whatsoever detrimental or liable to be determintal to the health, morals, comfort, safety, convenience, or welfare of the inhabitants of the city and all nuisances and causes thereof.

"Sec. 26. To prescribe limits within which business, occupations and practices liable to be nuisances or detrimental to the health, morals, security, or general welfare of the people may lawfully be established, conducted, or maintained.

"Sec. 35. To exercise all powers granted or not prohibited to it by law which it would be competent for this charter to enumerate."

That a municipal corporation possesses and can exercise only such powers as are declared in express words, or which may fairly or necessarily be implied in or are incident to those expressly granted, or are essential to the objects and purposes of its existence and are indispensable, not simply convenient or desirable, are canons of construction in the interpretation of municipal powers too well established by numerous decisions to require citations in their support. It follows that where a corporation is empowered by its charter, as in this instance, to enact an ordinance for a specific purpose its power is limited to the object specified. [St. Louis v. Transfer Co., 256 Mo. 476.]

It may be admitted that such a construction should not be given as to defeat the evident purpose of the enactment, but that the intent of the framers should be determined, not from a strict or strained interpretation, but from a reasonable one in view of the terms employed and the object sought to be attained. [State ex rel. v. Allen, 183 Mo. 283; State v. Herthel, 88 Mo. 128; Union Depot Railway Co. v. Railway, 105 Mo. 562.]

Guided by these general rules the meaning of the charter provisions, above quoted, and the extent to

which they may be applied in the enactment of the ordinance should not be difficult of determination.

It is scarcely necessary to add in this connection, that these provisions, constituting as they do, a part of the organic law of the city, define the limits within which the power delegated to the latter by the State may be exercised. Section 25, as is evident from its terms, authorizes legislation to prohibit, suppress or regulate objectionable businesses or vocations; and Section 26 confers power to enact ordinances defining the territory within which certain occupations may be conducted. If, as we hold, these sections embody the city's grant of power in this behalf, we need not consider Section 35. The dominant factors of these permissive provisions are the material welfare or the health and safety of the people. These accomplished and the limit of the restrictions upon the exercise of the police power, not only as contemplated by the National and State constitutions, but by these charter provisions, has been reached.

It may be admitted that we are living in an age of the rapid development of the police power which, as expressed by some authors, is no longer static, but has become progressive and moves, so far as concerns our civic and social relations, with the movement of public opinion. Justice HOLMES of the United States Supreme Court, in Noble State Bank v. Haskell, 219 U. S. 104, gives definite expression to this thought in saying that: "It may be said in a general way that the police power extends to all the great public needs. . . . It may be put fourth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."

In a later case in which the United States Supreme Court upheld a regulation upon the rental of buildings, Justice HOLMES, in further intimation of the extension of the police power, said: "Circumstances might so change in time as to clothe with a public interest what

at other times would be a matter of purely private concern."

In a learned and interesting article by Mr. Henry W. Chandler, of the Chicago bar, in a recent number of the American Bar Association Journal on the Attitude of the Law toward Beauty, it is said: "The recognition of beauty as an element to justify the exercise of the police power, which regulates without direct compensation to the person limited, has lagged after its recognition in the field of eminent domain where damages are paid. The police power is always drastic; whatever burden it entails the individual has to bear alone, and the courts therefore are cautious about imposing it. . . . They have not been willing to acknowledge beauty as a justification, but without admitting it they are more and more giving weight to the consideration of fitness and propriety in a man's use of his own. They may profess to put their decisions on other grounds, but in their hearts this is the directing motive."

This conclusion clearly defines the prevailing attitude of the courts. While their reasoning recognizes the aesthetic, their rulings, following the principles which had their origin in the common law concerning individual and property rights, are definitely utilitarian. Not only is this manifested in the adjudicated cases, but it finds frequent expression in the organic and statutory laws of the State and the charter and ordinances of its municipalities.

The terms of the charter provisions here under review are indicative of this purpose on the part of their framers. Certainly no more can be meant from the terms employed in the prohibition and suppression of certain callings than those which detrimentally affect the material welfare of the people; and the limiting of certain occupations and callings to a prescribed territory must in reason be subjected to a like interpretation. If this be true and these charter provisions lend no other reasonable coloring to the conclusion as to their meaning, then

this ordinance, the avowed purpose of which is simply an arbitrary exclusion of a definite business from a prescribed district, is in excess of the power with which the city saw fit to invest itself when it framed its organic law.

We are not without warrant for this conclusion. While the language of the charter is, in our opinion, sufficient to sustain the conclusion we have reached as to its object and purpose, the Supreme Court of Illinois, in People v. Chicago, 261 Ill. 16, denied the right of that city under its police power to prohibit the establishment of retail stores in a residential district on the ground that they were detrimental to the public health morals, comfort and the general welfare—in almost the exact terms employed in the instant case—and held that there was nothing inherently dangerous to the health or safety of the public in a retail store and that the objections to same arose from a purely aesthetic consideration and could not be sustained.

In an earlier case, Sign Works v. Training School, 249 Ill. 436, that court held that matters of taste could not be regulated by statute when unconnected with the safety, comfort, health, morals and material welfare of the people. Unless therefore, a different meaning be given to the words employed, the charter itself constitutes a sufficient restriction upon the enforcement of the ordinance. An ice manufactory, electrically conducted, in the absence of any objectionable features connected with its operation, is certainly no more subject to prohibition or restriction than a retail store.

Our rulings in this State concerning the exercise of the police power are in harmony with the conclusion reached in this case. In St. Louis v. Dreisoerner, 243 Mo. l. c. 223, the limitations of the police powers were thus defined: "The police power is a necessary and wholesome faculty of municipal government, but it only extends to the regulation of employments prejudicial to the public safety, health, morals and good government of the citizenry, and it 'ends where those public interests are not beneficially served thereby.' [Gunning Co. v. St. Louis, 235

Mo. l. c. 200.] It cannot sanction the confiscation of. private property for aesthetic purposes.''

In St. Louis v. Liessing, 190 Mo. l. c. 480, which construed an ordinance subjecting milk and cream to inspection and regulating the sale of same, this court speaking through GANTT, J., in upholding the validity of the ordinance, said, in effect, that the inspection of the food product there in question was authorized by the charter and that the purpose of its adoption was to secure the general health of the inhabitants, which constituted a sufficient ground for the upholding of the police power delegated by the State to the city.

In an opinion by HIGBEE, J. (City of St. Louis v. Evraiff, 301 Mo. 231), this court held, upon like grounds to those stated herein, that the ordinance under review was invalid in that it imposed restrictions upon the use of private property having no relation to the health, safety, comfort or welfare of the inhabitants, and constituted a deprivation of the use of same in violation of the Constitution. We have found no reason for differing from the conclusion there reached.

In conclusion it is deemed pertinent to add in a general way that the necessity for the existence of civil government lies in the protection it affords to the rights of the individual. Laws enacted for this purpose, by which the government manifests its power, are necessarily more or less restrictive in their nature. They should therefore embody in their terms evidence that they will at least not lessen if they do not add to inalienable rights. That enactments in the exercise of the police power are restrictive in character does not admit of argument. Unless, therefore, it can be shown that they add to or tend to make an addition to fundamental rights they are not justified.

It therefore follows that our peremptory writ herein should issue and it is so ordered. *Woodson, C. J.,* and *David E. Blair, J.,* concur; *Graves, J.,* concurs in result in separate opinion; *White, J.,* dissents in separate opinion in which *Ragland* and *James T. Blair, JJ.,* concur.

GRAVES, J. (concurring).—This is one of the several cases pending in this court growing out of zoning ordinances. The questions really involved are perplexing ones, and upon them are diverse opinions from the courts. These opinions are always shaded more or less by the peculiar constitutional provisions of the State. The opinion by our learned associate, Judge WALKER, would preclude any zoning ordinance in St. Louis, and for this reason, among others, I concur in the result only of his opinion. My personal views follow.

I. Among the first zoning cases to reach this court was the case of In re Kansas City Ordinance No. 39946, or otherwise styled, Kansas City v. Liebi, 298 Mo. 569. In that opinion, I concurred, and Judge WALKER dissented. His dissenting opinion in that case is made one of the corner stones of the present opinion. It suffices to say that the views of his dissent never became the views of the court. In a broad sense no property or property right can be taken from the individual except through the police power of the State. This power may be exercised to abate a nuisance, to restrict the uses of property to lawful and non-deleterious purposes, or to take private property, or rights growing out of property, for public use upon payment therefor. In other words, eminent domain is but a limited use of the police power of the State. I know that cases and text-writers distinguish between the police power and eminent domain, but in ultimate analyses the basic principle of eminent domain is the inherent police power of the sovereign State. So that, in my judgment, eminent domain is but the limited exercise of the police power. So that in some cases rights in property may be limited, through the police power, without compensation, whilst other cases require compensation.

The value of property is dependent upon the uses to which it may be put. To limit the use is a restriction upon the right of property, and should not be made without compensation, unless the right restricted would, if exercised, rise to the plane of a public nuisance. The ordinance here goes much further. It restricts the use

of property (a vested property right) without reference to the deleteriousness or harmfulness of the uses eliminated by the terms of the ordinance, and this without compensation, or even inquiry as to the damages that might be done.   The foregoing would suffice to justify my concurrence in the result of the opinion.

II.   The first vital question in all these cases is whether or not the use for which the property or some interest or right in the property is taken, is a public use.   If not a public use, then the private property cannot be taken.  We ruled in Kansas City v. Liebi et al., supra, that the use was a public use, and that private property could be taken for such use.   That ruling was a step forward, but I agreed to it then, and agree to it now.   In that case the property was not bodily siezed and taken under the broader meaning of the police power, but it was taken under the limited exercise of the police power, as found in the recognized doctrine of eminent domain.   The effect of that case is that the taking of property( restricting the use is the taking or damaging of property and property rights) for the purpose covered by the ordinance, was a taking for a public use, and was justified when provision for the payment of damages was contained in the ordinance.   In other words, we ruled in that case (1) that the use was a public use, and (2) that private property could be taken for that use if the owner be compensated therefor.  This is as far as I understand that case goes.   It could not go further without containing *obiter,* because such were the only issues involved.   I am of the opinion that zones within cities can be legally established as in Liebi's Case, but I am not willing to go further.   The St. Louis ordinance (involved here) goes much further, as we have indicated.   There is no thought of compensation for restricting the legal use of property.   It provides for the bald taking of property rights under the very broadest exercise of the police power.   It is not a situation which calls for such exercise of the broad power.   With these views I concur in the result only of my learned brother's opinion.

State ex rel. Penrose Investment Co. v. McKelvey.

WHITE, J. (dissenting).—I.    I an unable to agree to the conclusion reached in the majority opinion.   The effect of that conclusion, instead of protecting the citizens of St. Louis in the enjoyment of their property rights, is to render the city powerless to protect them.   The person, the use of whose property is restricted, alone Rights of is considered.   The great majority, the enjoy-Other Citizens. ment of whose property requires such re-striction, are ignored.   In balancing the alleged individual right against the public good the latter is given no weight.

The opinion distinctly excludes from consideration the reasonableness or unreasonableness of the zoning ordinance, or of the particular part of it affecting the relators' case.   A consideration of the ''legal propriety'' of the classification of districts, which would involve an admission of the validity of the ordinance, is disclaimed. The right of the city to provide for future growth and development by dividing its territory into residence districts, commercial districts, industrial districts, etc., is denied.   The Legislature cannot invest the city with power to segregate its factories.

II.    It is said that exercise by the State of police power, an attribute of sovereignty, is limited, and in this instance prohibited, by the Fourteenth Amendment to the Federal Constitution, and by Sections 21 and 30, Article 2, of the State Constitution, on the Right to Use of theory that the effect of the ordinance Private Property: Due Process. is to deprive persons of their property without due process of law.

Section 3 of the ordinance provides that in general ''the use or uses of all buildings existing at the time of the adoption of this ordinance may be continued.''   No exception to the operation of that general provision is claimed for relators; they are in the same position as all owners of property in the district where their property is located.   The ordinance in its avowed purpose and in its effect is to provide for the future; for the or-

derly, symmetrical, healthful and prosperous growth of the city; to make it attractive to business enterprises, a healthful, secure and enjoyable place to live. These purposes, we are told, cannot be carried into effect in the exercise of police power because of the restrictions in the Federal and State Constitutions above noted.

III.    The majority opinion does not cite any case which holds that a general zoning ordinance is unconstitutional. There are some cases to that effect, notably Spann v. City of Dallas, 235 S. W. 513, and Willison v. Cooke, 130 Pac. (Colo.) 828. Those cases,

Zoning Ordinance: however, turn more upon the legislative
Constitutional. grant of power to the cities than upon the constitutional limit upon the exercise of police power by the State.

The following authorities hold that a general zoning ordinance or an ordinance having an effect similar to the provision under consideration here, is constitutional; its operation and enforcement within the police powers of the State as delegated to cities, and not prohibited by the Fourteenth Amendment to the Federal Constitution: Ware v. City of Wichita, 214 Pac. 99; Palmer v. Mann, 198 N. Y. Supp. 548, 1. c. 552; City of Utica v. Hanna, 195 N. Y. Supp. 225; City of Des Moines v. Manhattan Oil Co., 184 N. W. (Iowa) 823; Opinion of Justices, 234 Mass. 597, 1. c. 603; Attorney-General v. Williams, 174 Mass. 476; Cliffside Park Realty Co. v. Borough, 114 Atl. (N. J.) 797; Schait v. Senior, 117 Atl. (N. J.) 517; Knack v. Scrap Iron Co., 189 N. W. (Mich.) 54; State ex rel. v. Houghton, 144 Minn. 1. And there are others.

It must be a clear infringement of the individual rights under the Constitution before a measure in the exercise of the State's police power will be held unconstitutional. It was said by the United States Supreme Court in Chicago & Alton Railroad Co. v. Tranbarger, 238 U. S. 67, 1. c. 77, that the provisions of the Federal Constitution did not have "the effect of overriding the power of the State to establish all regulations reasonably

necessary to secure the health, safety or general welfare of the community."

The same court in the case of Mountain Timber Company v. Washington, 243 U. S. 219, l. c. 238, said: "The authority of the state to enact such laws as reasonably *are deemed to be necessary* to promote the health, safety and general welfare of their people, carries with it a wide range of judgment and discretion as to what matters are of sufficiently general importance to be subjected to state regulation and administration."

It is further declared in the same case, quoting from an earlier case: "The police power of a state is as broad and plenary as its taxing power."

The Supreme Court of Iowa in the case of Des Moines v. Oil Company, supra, 184 N. W. l. c. 826-827, held that:

"With the changing conditions necessarily attendant upon the growth and density of population and the ceaseless changes taking place in method and manner of carrying on the multiplying lines of human industry, the greater becomes the demand upon that reserve element of sovereignty which we call the police power for such reasonable supervision and regulation as the State may impose, to insure observance of the individual citizen of the duty to use his property and exercise his rights and privileges with due regard to the personal and property rights and privileges of others."

The great weight of authority, both Federal and State, is to the effect that a reasonable zoning ordinance is constitutional, and the determination of what is reasonable varies with the changing conditions incident to modern development and civilization. The effect of the ruling in the majority opinion is that before an occupation or a building can be prohibited in a given territory it must be proven as a fact to be a nuisance, as nuisances have been defined and determined heretofore. What may be a nuisance now is a very different thing from what may have been a nuisance in time gone by; what affects the public health and safety now is very different

from what was considered as affecting the public health and safety heretofore. This matter will be considered in the next paragraph (IV) in discussing the general grant of the State to the city of Saint Louis.

A complete answer to the pronouncement that the classification provided in the ordinance is in violation of the Fourteenth Amendment to the United States Constitution appears in the ruling of the United States Supreme Court. It was held by that court in Welch v. Swasey, 214 U. S. 1. c. 105-106, that a statute of Massachusetts regulating different heights of buildings in different sections of the city of Boston was not in violation of the Constitution.

The United States Supreme Court in case of St. Louis Poster Adv. Co. v. St. Louis, 249 U. S. 269, held constitutional the ordinance regulating the size, position and construction of bill-boards on private grounds, although Mr. Early urged upon the court that the regulation was in violation of the Fourteenth Amendment and bore no relation to the health, safety or morals. The opinion there refers to the bill-board cases decided by this court, St. Louis Gunning Co. v. St. Louis, 235 Mo. 99, and Kansas City Gunning Co. v. Kansas City, 240 Mo. 659, where the ordinance was held constitutional. Judge WOODSON very aptly quoted in the first Gunning Case, 235 Mo. 1. c. 167:

"The Constitution of this State, in the Bill of Rights, provides that all persons have a natural right to life, liberty and the enjoyment of the gains of their own industry. . . . This, of course, does not confer upon anyone the absolute right to use his property as he pleases. No such right exists in a state of civil society; but on the contrary, the right of one to use his own must always be exercised in subordination to the right of others. . . . The same instrument provides that no persons shall be deprived of life, liberty or property without due process of law. Clearly this provision was not intended to withdraw the rights of private property from the reasonable exercise of the police power by the

legislative branch of the government. *'All rights are held subject to the police power of the State.'*"

If the bill-board ordinances are constitutional, as this court held, then the zoning ordinance is constitutional, as a valid exercise of police power. In other words, the State, in the exercise of that power, as an attribute of sovereignty, is not in violation of the Fourteenth Amendment, nor of its own similar constitutional pro vision, when by statute or by authority delegated to cities, it seeks to protect its citizens in the enjoyment of their property by restricting the use of other property. The Constitution is the instrument by which the State protects *itself* and secures to its citizens the enjoyment of their possessions. If the Constitution is so inflexible in its terms, so rigid in its specific restrictions, as to defeat its own ends; if its general principles cannot apply to changing conditions due to increased population, congested areas, new methods of transportation, new developments of sanitary science, new inventions to meet multiplying needs, the multitude and variety of new and powerful mechanical appliances—all presenting problems affecting health and safety, which the framers of the Constitution could not possibly have foreseen—then it is necessary to "alter or abolish" it.

IV. The grant of powers to the city of St. Louis by the State is contained in the charter in the following sections of Article I of the city charter:

"(25) To define and prohibit, abate, suppress and prevent or license and regulate all acts, practices, conduct, business, occupations, callings, trades, uses of property, and all other things whatsoever

**Ample Charter Authority.** detrimental or *liable to be* detrimental to the *health, morals, comfort, safety, convenience* or *welfare* of the inhabitants of the city and all nuisances and causes thereof.

"(26) To prescribe limits within which business, occupations and practices *liable to be* nuisances or detrimental to the *health, morals, security or general welfare*

of the people may lawfully be established, conducted or maintained.

"(35)  To exercise all powers granted or not prohibited to it by law or which it would be competent for this charter to enumerate."

This is the usual comprehensive and general statement of police powers.  While specific authority to pass a zoning ordinance would be more explicit, I think the power to do so is embraced in the general terms of the charter.  It will be interesting to note what some of the authorities say in relation to the particular problem which we have under consideration.

The Supreme Court of Kansas in the Ware Case, 214 Pac. 99, had under consideration an ordinance prohibiting a business building in certain residential districts, and, holding the ordinance valid and constitutional said, 1. c. 101: "With the march of the times, however, the scope of the legitimate exercise of the police power is not so narrowly restricted by judicial interpretation as it used to be."  And further: "Such legislation is merely a liberalized application of the *general welfare* purposes of State and Federal Constitutions."  The Court then distinguished the Texas case, Spann v. City, supra.

The Supreme Court of New Jersey, in regard to an ordinance prohibiting the erection of a garage in a certain residence locality, 117 Atl. 517, said 1. c. 518: "The provision of the ordinance prohibiting the granting of the permit in such circumstances *is a reasonable regulation touching public health, safety and general welfare,* and is within the scope of the police power of the town, and is consequently valid."

Likewise, the Supreme Court of New Jersey, in Cliffside Park Realty Co. v. Borough, 114 Atl. 797, in considering a zoning ordinance which prohibited a certain kind of business building in a residential district, said: "I do not think the act itself is unconstitutional *in toto,* as it is, in fact at least, plainly passed as an exercise of the legitimate police power, for it says the regulations

authorized 'shall be designed to promote the *public health, safety, and general welfare.'* ''

The Supreme Court of Massachusetts, in an opinion requested by the Legislature regarding building regulations and the classification of building districts, gave this statement, 234 Mass. 603: ''The *public health,* the *public safety,* the *public morals,* and, when defined with some strictness so as not to include mere expediency, the public welfare, each repeatedly has been held sound ground for the exercise of the police power.''

In the Minnesota Case, supra, the Supreme Court of that State, 144 Minn. l. c. 19, held that the building of a large flat building in a restricted residential district was properly prohibited by ordinance, and uses this language: ''In the large cities, where the lots for residences must necessarily be of the minimum size, especially where the man of small means must dwell, it is readily seen that if a home is built on such lot and thereafter three-story apartments extending to the lot line are constructed on both sides of the home it becomes almost unlivable and its value utterly destroyed.''

The Supreme Court of Michigan, in the case of Knack v. Scrap Iron Co., 189 N. W. l. c. 55, said in relation to the erection of a junk yard in a residential section: ''In the absence of any information on the subject, we may assume that the city authorities had some reasonable purpose in closing certain districts to the junk business,'' and quotes from Dillon on Municipal Corporations to the effect that under all the circumstances the authorities of the city were better judges of the necessity of such ordinance.

The Supreme Court of New York, in City of Utica v. Hanna, 195 N. Y. Supp. 225, in holding valid a zoning ordinance, said this, l. c. 226-227: ''Within reasonable limits the common council of the city of Utica in this case was empowered to determine whether the regulative and restrictive provisions of a general plan would promote the *public health, safety,* or *general welfare,* with reasonable consideration to the character of the district, the pe-

culiar suitability for particular uses, *the conservation of property values,* and the direction of city improvement.''

In Palmer v. Mann, 198 N. Y. Supp. 548, the New York Supreme Court, construing a zoning regulation, had this to say, l. c. 552: ''Since the amendment was within the power of the body which passed it, *the presumption* is that it is reasonable and just, and the judicial power to declare it void can be exercised only when, from the inherent character of the amendment, or *from evidence showing its operation and effect,* it is demonstrated to be otherwise.''

The majority opinion cites the case of People v. Chicago, 261 Ill. 16, where it was held the erection of a business building in a residence district, in the absence of any showing of its objectionable character, was not within the police powers of the city. But that same Illinois Supreme Court in a later case, People ex rel. v. Village of Oak Park, 266 Ill. 365, held that it was within the police power of the village to prohibit the erection and operation of a public garage in a residence district. The court said, l. c. 370: ''Whether an ordinance is unreasonable and void is a question of law for the court.'' And quoting from an earlier case: ''The rule is, that it requires a clear and strong case to justify a court in annulling the action of a municipal corporation acting within the apparent scope of its authority.''

This court said in the St. Louis Gunning Case, 235 Mo. 201: ''The courts, as a rule are not as good judges of the necessity for or reasonableness of laws as are the lawmakers, who are elected by the people themselves.''

In the case of St. Louis v. Theatre Co., 202 Mo. l. c. 699-700, this court made this important observation: ''What the urgent necessities of the public are in a crowded city, we are unable to judge, without more than the legislative act in the shape of an ordinance. *'Municipal corporations are prima facie the sole judges of the necessity of their ordinances,* and courts wild not, ordinarily, review their reasonableness, when passed in strict pursuance of an express grant.' ''

The weight of authority sustains the right of a city, under a grant of power, such as here, to pass a general zoning ordinance like the one under consideration. I have italicized some portions of the above quotions, which are significant.

The relators seek to establish a plant for the manufacture of ice, which it is said will be electrically-driven and operated, and in furnishing the power will be free from the smoke and dust incident to coal burning. It is admitted that before classifying the city into districts in pursuance of the zoning ordinance, the commission had many public hearings at which any one and every one affected had a right to present his views. The ordinance also provides for an appeal from the City Plan Commission's order; the relators in this case had a hearing before that commission and the erection of the plant was opposed by the owners of a large amount of the surrounding property. The City Plan Commission, after the hearing, refused to permit a change in the plan so as to allow the location of the relator's plant.

While it is said that the proposed plant is free from the objections incident to coal-burning in the operation of its machinery, it is nevertheless, a manufacturing plant. It necessarily involves the operation of machinery, perhaps heavy machinery, which is not said to be noiseless. Doubtless chemicals will be used in the production of artificial cold with a possible incidental odor arising from their use. It certainly will involve the passage in and out and along the street of heavy trucks loaded with ice, if the relators expect to do any business. It must have the usual incidents of a manufacturing establishment.

The owner of property in the neighborhood naturally object. To hold that the relators may do what they please with their own property is to ignore the rights of other property owners and the effect upon its value, and is in violation of the well-established rule that a man may use his own property in any manner he pleases, provided he does not, by doing so, injure some other person. We

said in the case of Kansas City v. Liebi, 298 Mo. 1. c. 593; "In the very nature of the case, modern conditions and the increasing interdependence of the different human factors in the progressive complexity of a community make it necessary for the government to touch upon and limit individual activities at more points than formerly."

Standards of living are much higher than they used to be and are growing higher and more exacting with the material improvement of the people's condition. It has not been so very long since people lived over their stables, allowed chickens to roost in the rafters of their dwelling, and pigs to make themselves comfortable under the floor. Such was not known to be unsanitary.

Consider the case of owners of property in this locality. They have made their homes there, not only on the theory that the zoning ordinance had been in operation for several years, but upon the general confidence that that would be a residence district. If one manufacturing plant is allowed to be established there, another could not be denied. If an ice plant, then another plant electrically driven, and another, until it would render homes there uninhabitable and according to present standards reduce their value to a point where they could not be sold. It would doubtless affect the market value of their property so that the damages to each one would be much greater than the damage which would accrue to the relators if prohibited from proceeding with their purpose.

It is true that aesthetic considerations alone will not authorize the employment of police power, and impairing the aesthetic quality of one's property by the use of neighboring property would not of itself justify the interference, but, if through the destruction of its aesthetic properties the homes of an entire community are rendered uninhabitable and their pecuniary value is destroyed, another question arises. If unsightly surroundings, disagreeable odors and obstructive traffic destroy the convenience and the value of a person's property, the injury is as definite and complete as if a chasm had been digged across his front yard. But it is not necessary to

State ex rel. Penrose Investment Co. v. McKelvey.

depend upon aesthetic conditions for the validity of the ordinance.

There is the matter of health. The State's interference in an individual's liberty is not limited, as formerly, to vaccination and quarantine against contagion. The recent discoveries of medical science show that a thousand perils, unsuspected a generation ago, swarm in the atmosphere of a busy street. For instance, the poisonous gas from the exhaust of a gasoline engine is dangerous to health, even in the open spaces of city thoroughfares. Healthful surroundings mean not only freedom from contagion and poisonous gases, but freedom from disturbing noises and the confusion of traffic and other incidents which disturb the quiet and peace of one's home. The City Planners are better judges of those matters than the courts.

It is fundamental in our institutions that a man's "house is his castle." It is the one sacred spot where his liberty, his rights, and his comfort shall not be interfered with or impaired by the action of another. The multiplying agencies to keep in operation the complex modern civilization tend more and more to encroach upon those rights and the enjoyment of one's home, and demand more and more restriction to prevent such encroachment. In districts where costly dwellings are erected, protection against damaging structures is obtained by building restrictions. But it is not practical so to protect the poor man's home.

V. The city must be considered as a whole, in interpreting the grant of power. No general rule of law can be enforced without incurring complaints of hardship in some instances. The "general welfare" of a large city like St. Louis involves a comprehensive view of the community needs. The experts on planning, the intelligent and informed citizens who carefully studied the welfare of the city, its present and future needs, its prospective growth and prosperity, determined upon the plan at-

General Welfare, Health and Safety.

tacked. We said of such matters in the Kansas City Case, 298 Mo. l. c. 591: ''The planning of the city in relation to the use of different parts would tend to prevent over-crowded and congested districts, thereby *promoting health and the general welfare of the city,* would make the city more attractive and thereby promote its growth and general prosperity.''

To that statement a majority of this court agreed. The ''general welfare'' is promoted, the ''health,'' ''safety'' and ''convenience'' of the people as a whole conserved, and their property rights protected, by measures which will tend to prevent congestion of population, secure quiet residence districts, reduce the danger of traffic accidents, simplify sanitary regulations, make the city a more attractive, enjoyable place to live, promote its prosperity, and secure to property a stability of values.

If it is necessary to inquire in each case whether a forbidden building or occupation is in fact a nuisance, not only would endless suits ensue, but the same incidents which constitute a nuisance by the holding of one court or jury would be held harmless by another. It is only by a comprehensive view of the entire community and a grasp of its needs, considering all the people, by trained, informed minds, and sympathetic understanding, that practical and satisfactory results can be achieved.

The Utica Case, 195 N. Y. Supp. 225, held an ordinance prohibiting a gasoline station invalid, solely because it was *not* passed pursuant to a definite *''general plan,''* but held a general zoning ordinance within the city's power.

One of the astonishing, unforeseen incidents of modern traffic is the multiplying numbers of motor-driven vehicles. It is a matter of common knowledge that all streets are too narrow and all open spaces too limited—a condition which affects the *''convenience''* and the *''safety''* of everybody who travels the streets. At the same time, the general use of rapid private transit makes convenient access to a distant part of the city for people to

whom it was formerly almost inaccessible, thus rendering the close proximity of residences and factories wholly unnecessary. We must assume that the city authorities have studied the problems arising from congested traffic, overcrowded areas, multiplying casualties from street collisions, and the demands of sanitary science, before classifying the city into districts. If the *danger* and inconvenience of congested traffic will be abated or even limited by the classification under consideration, then the ordinance is authorized in the interest of the general welfare, and the city authorities, prima-face, are the best judges of whether that classification will produce that effect. There is nothing in the record to indicate that the city authorities in passing the ordinance, or the planning commission in classifying the districts, have acted arbitrarily, oppressively, or in unfair discrimination against anyone, particularly the relators.

I think, the peremptory writ should be denied. *James T. Blair* and *Ragland, JJ.*, concur in these views.

ON MOTION FOR REHEARING.

GRAVES, J.—Reading with care the motion for rehearing, and the many suggestions thereon, in this case, I am led to the conclusion that learned counsel have misjudged my separate concurring opinion. I have fixed views in these cases, and to the end that my position may be clear, I write again, although, in the main, it is largely a reiteration of what I have written.

I. (a) In my previous opinion, I undertook to state (and think I did state) that under our Constitution private property could not be taken or damaged for anything but a public use. In other words, that private property could not be taken for a private use. This, under our Constitution, both Federal and State, is axiomatic.

Former Opinion: Elucidation.

(b) I stated that in the Liebi Case (the Kansas City ordinance which in effect created a city zone) this court had reached the limit of the law in declaring that the zoning, as in such ordinance provided, was a public purpose for which private property may be taken.

(c) I held that under the broad exercise of the police power certain uses of private property might be prohibited, without compensation, as in cases of nuisances, but I further held that the lawful uses to which property could be put gave it the value which it possessed, and such lawful uses could not be restricted, and the value destroyed or partially destroyed, even for a public use or purpose, without compensation. This because the Constitution prohibits the taking or damaging of private property, even for a public use, without just compensation.

(d) I further held that there could be city zoning, as there was in Liebi's Case in Kansas City, when there was compensation for the property rights cut off and destroyed, but that the St. Louis ordinance, involved here, took private property for a public use without compensation, and for that reason was void. It will not do to say, under our Constitution, that a person can be deprived of the legitimate uses of his property, simply because so to do might preserve the value of some other property for a certain stated use.

(e) I further held that to strip property of the uses (legitimate uses) to which it might or could be put was to strip it of value, and that such act would be the damaging of private property for a public use and could not (under our Constitution) be done without compensation.

(f) I disagreed with my brothers of the majority opinion upon the question of the grant of power in the city charter. I think that, if the State could grant to the city the power to write an ordinance of the character here involved, such power has been given to the city. My position is that the State could not grant or give such power to the city under our Constitution, and if it has attempted such a grant of power it is void.

I trust that this reiteration is too plain for further misconstruction.

II. Having tried to make my position clear, supra, I pass to some reasons therefor which I did not assign

State ex rel. Penrose Investment Co. v. McKelvey.

in my separate concurring opinion. First, may I say that I have never been able to depart from the idea that this is a constitutional government, both in the Nation and in the State, and that these constitutions were intended to protect the citizen in his property rights. Unlike the "faddist" (either public or private, for there are both kinds of "faddists") I have been unable to endorse the view, "What is a Constitution as between friends?" In other words, the constitutional inhibitions must not be set aside or wiped out by every wave of popular clamor. There is too much disposition to set aside and ignore the organic law when there is a popular wave demanding such course. It is for the courts to steady the ship of state and hold the organic law intact.

*Constitutional Restrictions.*

III. As stated above we ruled, and I think properly ruled, in Liebi's Case, that city zoning was a public purpose and a public use, for which private property might be taken. But this does not authorize the taking without compensation. The Fifth Amendment of the Federal Constitution closes with this language: "Nor shall private property be taken for public use without *just compensation.*" The ordinance before us violates this provision in that it takes private property for a public use without compensation.

*Zoning Ordinance: Damage for Public Use.*

Section 20 of Article II of the Missouri Constitution prohibits the taking of private property for private use "except for private ways of necessity, and except for drains and ditches across the lands of others for agricultural and sanitary purposes." These are the only exceptions to the otherwise absolute prohibition. There is another very vital portion of this Section 20 which reads: "That whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a *judicial question,* and as such *judicially determined, without regard to any legislative assertion that the use is*

*public.''* It thus appears that the much-flaunted edict of the city legislature has but little to do in the determination of the matter. If private property is to be taken for the general welfare (as an alleged public use) it is for the courts to determine whether or not it is a public use, irrespective of legislative declaration that it is such; and if declared to be a public use by the courts, then the private property may be taken, but not without compensation. So says the Federal Constitution, supra.

Our State Constitution is a little broader, in that Section 21 of Article II provides: ''That private property shall not be taken *or damaged* for public use without just compensation.'' Note the words ''or damaged'' in our constitutional provision. The property does not have to be actually taken for the public use, but it suffices (for the purpose of compensation) that it be merely damaged in the furtherance of the public use. It is the uses to which property may be put which gives it value. Strip it of all its uses and the property is as worthless as the most barren spot of the Great Desert. Strip it of a part of its legitimate uses and you have damaged it to the extent of the uses cut off. The restrictions upon the legitimate use of property inflicted by this ordinance is a destruction of the property *pro tanto;* and there being no provision for compensation, the ordinance is void. [St. Louis v. Hill, 116 Mo. 527; St. Louis v. Dorr, 145 Mo. l. c. 485 et seq., including the dissenting opinion of SHERWOOD and BURGESS, JJ.; St. Louis v. Dreisoerner, 243 Mo. 217.] These three cases condemn the ordinance here involved. They were well considered. They have never been overruled and stand as the law of the State today. In the language of SHERWOOD, J., in the Hill Case, supra, 116 Mo. l. c. 533:

''Property, then, in a determinate object, is composed of certain constituent elements, to-wit: The unrestricted right of use, enjoyment and disposal, of that object. It follows from this premise that anything which destroys or subverts any of the essential elements aforesaid is a taking or destruction *pro tanto* of property,

though the possession and power of disposal of the land remain undisturbed, and though there be no actual or physical invasion of the *locus in quo.* [Cooley's Constitutional Limitations (6 Ed.) 670; Wynehamer v. People, 15 N. Y. l. c. 433, per SELDEN, J.; People v. Otis, 90 N. Y. l. c. 52, per ANDREWS, C. J.]

"The use of a given object is the most essential and beneficial quality or attribute of property; without it all other elements which go to make up property would be of no effect. If the city were allowed to deprive the defendant of the use of his entire lot, it would leave in his hands but a barren and barmecidal title; and what is true of property rights as an integer is true of each fractional portion.

"If plaintiff's theory be correct, then the city could pass and enforce an ordinance, which would deprive defendant of the use of his entire lot, and still there would be no taking within the terms of Section 21, Article 2, of the Constitution, and consequently, no right to compensation. The statement of such a position is sufficient to accomplish its utter repudiation.

"The day before the ordinance went in to operation, defendant had the unquestionable right to build at will on his lot; the day afterwards he was effectually prevented from building on the forty-foot strip, except under peril of punishment, as if the city had built a wall around it, and this too without any form of notice, any species of judicial inquiry, or any tender of compensation. If this is not a 'taking' by mere arbitrary edict, it is difficult to express in words the meaning which should characterize the act of the city."

The case was dealing with a restriction upon the use of property upon boulevards, but it is equally applicable to the restrictions upon the use of property involved in this ordinance. In the matter of restricting the lawful use of property there can be no difference between the boulevard and a stated district.

In the Dorr Case, supra, on the strength of the Hill Case, supra, it was ruled that an ordinance which pre-

vented a confectionary store on Washington Boulevard in St. Louis was void because violative of the constitutional provision we have above outlined.

Even the bill-board opinions recognized the rule in the Hill Case, but distinguished it in St. Louis Gunning Co. v. St. Louis, 235 Mo. l. c. 151.

The ordinance before us provides for the taking of private property for a public use without compensation and without a judicial hearing. It is not. regulation which would fall within the reasonable exercise of the police power. It is a confiscation, pure and simple. The motion for rehearing should be overruled. *Woodson, C. J.,* and *David E. Blair* and *Walker, JJ.,* concur in these views.

WHITE, J. (dissenting).—The motion for rehearing has assumed as much importance as the matters considered on the original hearing, because the opinion on the overruling of the motion, written by Judge GRAVES, clarifies the position of the majority.

Having at the time the motion was overruled obtained leave to file an opinion, I submit my reason for dissenting from that ruling.

I.   The opinion of Judge GRAVES, in which the majority concur, holds expressly that the zoning ordinance condemned by the opinion is within the express terms of the grant of power in the city charter, but that under the Constitution the Legislature was powerless to grant authority to the city to pass such an ordinance.

Zoning Ordinance: Within Police Power.

In the original opinion written by Judge WALKER, the majority, excepting Judge GRAVES, concurred in the ruling that the ordinance was *not* within the terms, express or implied, of the grant of power contained in the charter. All who held that opinion have now receded from that position and unqualifiedly concur in Judge GRAVES's ruling that it is not the lack of charter provisions, but

the restrictions of the Constitution which invalidate the ordinance.

Much has been said about the unreasonableness, the arbitrary and oppressive effect, of the zoning ordinance as its provisions were carried out by the planning commission. But that question was not considered. Neither was there before the court any question of the unreasonableness or oppressiveness of that feature of the ordinance which affects the relators in this case. The majority opinion holds squarely that the city of St. Louis has no constitutional power whatever to pass *any* zoning ordinance; that the ordinance here is void, not merely in some particulars, but *in toto;* the Legislature cannot authorize any city to segregate its factories and thereby prevent the transformation of districts devoted exclusively to residences into manufacturing districts, thus rendering the homes in such districts uninhabitable. That effect is to be especially noted, for there is no way of avoiding that conclusion from the opinion rendered.

II.  The constitutional question presents a peculiar aspect. Section 21, Article II, of the Constitution, is pointed out, providing that property shall not be taken or *damaged* for public use without just compensation; also Section 20 of the same article, providing that "whether the contemplated use be really

Eminent Domain: public shall be a judicial question."
General Damage
to Public.     It is assumed that the restriction upon the use of relator's property is a public use; that relators are damaged by virtue of such restriction, and, therefore, under the Constitution the restriction cannot be enforced without compensation. Let it be conceded for the purpose of argument that such restriction is a public use, so judicially determined in the Liebi Case, 298 Mo. 569, and that the relators are damaged by the restriction. Then follows the principle thoroughly established in this State: that where property merely is damaged for public use, if the damages claimed are the same as those suffered by all others, though

different in degree, then such damages are not included in the term "damage" as used in the Constitution. The question arose in the case of Van de Vere v. Kansas City, 107 Mo. 83, where the plaintiff sought to enjoin the building of a fire engine house. The court said in relation to the claim of damages which the plaintiff would suffer, l. c. 89-90: "The plaintiff, if suing for consequential damages, must show that he suffered an injury special. and peculiar to his property, and it was not enough to show a damage the same in kind as that suffered by other persons, though different in degree." That ruling has been expressly approved in later cases (Gorman v. Railroad, 255 Mo. 483, l. c. 495; Peters v. Buckner, 288 Mo. 618, l. c. 637-638), where Judge GRAVES in a concurring opinion endorses the above language.

It cannot be claimed that the relators here suffer a restriction different in kind from that affecting every other person. It is imposed alike upon all, including those who oppose the relators' plan. There is nothing in the record to indicate that the relators suffer any damages peculiar to them or to their property.

It is conceivable, though extremely improbable, that some person affected by the ordinance may suffer peculiar individual damages. If so, such person would have his remedy, but the remedy would not be the annulment of the ordinance.

Here comes in a distinction between eminent domain and police power. There are many distinguishing features in addition to the compensation in the one case and its absence in the other. Under the power of eminent domain the State, or a city duly authorized, may condemn or damage an individual piece of property, or may condemn a few properties without including others like situated, whereas, in the exercise of police power a regulation must be applied to all alike. In the former case the individual damage is peculiar to the person affected, while a restriction in the exercise of police power is not peculiar, but is general and applies to everybody.

Condemnation and Police Regulation: Distinction.

In the Liebi Case the question did not arise as to whether the restrictions contemplated, if applied, in a classification of districts to the entire city, would have been within the police power of the city. Likewise the question did not arise as to whether the parties, the use of whose property was restricted, would suffer any damage peculiar to themselves. That question will come before the trial court when the provisions of the ordinance are put in operation.

To hold that the zoning ordinance under consideration is within the terms of the grant to the city, and at the same time hold that it is without constitutional authority, is to hold that the grant of power contained in the city charter is unconstitutional in some of its provisions; what particular features of the grant are without constitutional authority has not been pointed out. That grant of power to the city simply expresses the scope of police power as usually understood by the courts. If it is unconstitutional, then the State of Missouri, on account of the inhibitions of its Constitution, is unable to exercise, or to delegate to its cities the exercise of, the general police powers which are usual attributes of the sovereign state. That is precisely the effect of the ruling.

Grant of Police Power.

Many times this court has used expressions which indicate that the express grant of power here is constitutional. In the case of State ex rel. v. Public Service Commission, 275 Mo. 201, l. c. 210-211, the last utterance of the court on the subject, it quoted with approval from the Federal Supreme Court the rule, as follows:

"It is established by repeated decisions of this court that neither of these provisions of the Federal Constitution has the effect of overriding the power of the State to establish all regulations reasonably necessary to secure the health, safety, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise. [Atlantic Coast Line v. Golds-

boro, 232 U. S. 548, 558 and cases cited.]   And it is also settled that the police power embraces regulations designed to promote *the public convenience or the general welfare and prosperity* as well as those in the interest of the public health, morals or safety.''   (The italics are in the opinion).

No plainer language could be used to declare constitutional authority for the police powers expressed.   And these are the very terms under which the city claims the right to restrict the use of property by the ordinance under consideration.   It follows that the ordinance is constitutional, because conceded to be within those terms.

III.   We must also consider the facts in this case. While there was no stipulation to that effect, the case was submitted on the pleadings which consist of the return and the answer or reply of relators. [Secs. 1982-1983, R. S. 1919.]   The petition for the writ merely alleges a compliance with the ordinances of the city

Facts of Case: Evolved from Pleadings. of St. Louis in regard to obtaining building permits.   Every statement of fact in the return must be taken as admitted, under Section 1983, unless denied in the answer to the return. The return makes certain allegations in regard to the maintenance of large stables, garages, and a number of horses, mules, ice wagons, etc., necessary in the conduct of the ice and fuel business and their contemplated constant use night and day.   These allegations in that form are specifically denied, but the denial is qualified.   It is not denied that there would be garages, stables, horses and mules, as contemplated by the plans of relators.   It is merely denied that they would be in *large* numbers and in *constant* use. The reply also alleges that the maintenance of the plant ''would not be a nuisance, *per se* or potential.''

There are other allegations in the return, however, which are not denied by the answer, and therefore stand admitted as follows:

''. . . that with the exception of a planing mill,

which was established many years before said zoning ordinance was enacted, the entire surrounding neighborhood to said proposed ice plant, for many blocks, is dedicated exclusively to residence purposes, and such small shops and stores as are usually located in a residence section of a large city; that the location, erection and operation of an industry such as is proposed by relators to be built upon such property *would transform said neighborhood into a manufacturing district,* and thereby inflict great financial loss upon the owners of residences in said neighborhood, and *render said neighborhood unfit for residential purposes;* that the erection, maintenance and operation of said industry in said neighborhood would greatly decrease the property values of all residences in the immediate neighborhood of said plant, and thereby inflict upon said property owners great financial loss and damage; that the residents of said neighborhood would be greatly annoyed and *inconvenienced* by the operation of said industry in said neighborhood and would thereby be *deprived of the peaceful enjoyment of their homes and residences;* that the erection of such an industry in said neighborhood would constitute in law and *in fact a nuisance to all the residents and property owners in said neighborhood,* and thereby inflict upon them great financial loss and damage, and the *deprivation of the full use and occupation of said property for residential purposes."*

It may be said that this quotation from the return alleges conclusions and generalities instead of specific facts. No objection was taken to that form of pleading; there was no denial of it, and in the nature of the case the respondent would be obliged to allege *what would occur* by reason of the allowance of the factory as shown by the tendency and purposes of other manufactures. Relators did not deny the allegations so as to put respondents to the proof, and those allegations stand admitted to be true, and as binding on the relators as if proved by evidence offered.

The averment in relators' answer to the return that

the contemplated factory would *not* be a nuisance *per se,* may be taken as true, because not denied by respondent. [Secs. 1983-1984, R. S. 1919.] Though promissory and conjectural, it may be conceded for the purpose of the argument, that it sufficiently denies the allegations relating to that matter in the return. The ruling of the majority, as shown by the trend of the argument and the condition of the pleadings, is that the city may prevent a factory which is itself a nuisance, but cannot prevent an accumulation of factories which would be a nuisance; the city may deal with nuisances in a small way, but cannot do so in a large way; it may suppress an individual nuisance, but not a collective one; if ten factories in the district would "render said neighborhood unfit for residential purposes" and deprive the residents "of the peaceful enjoyment of their homes" and constitute "in fact a nuisance," as alleged and not denied, the city cannot prevent that result without a showing that each individual factory is itself, independent of the others, a nuisance. I cannot agree that the Constitution so restricts the legislative authority.

IV. Section 20, Article 2, of the Constitution provides that where private property is taken for public use the question whether the use is public shall be a judicial question and judicially determined without regard to any legislative assertion that the use is public. The provision relates to the *taking* of property, not to the damaging of it. The following section, Section 21, provides for compensation when the property is taken or *damaged.*

*Property Damaged for Public Use: Not Judicial Question.*

However, that is unimportant. Suppose it may be fully conceded that the restrictions upon the use of individual property under consideration is a public use. It does not follow that every other question arising in relation to the matter is a judicial question to be judicially determined.

We said in the Liebi Case, 298 Mo. l. c. 591, that while

the courts must determine whether a use is public, "the propriety, expediency and necessity of a legislative act are purely for the determination of the legislative authority, and are not for determination by the courts. That applies to a municipal ordinance authorized by statute."

Of course, such determination by legislative authority must be reasonable and must not be oppressive. As shown above, the reasonableness of the ordinance is not in question here. Likewise this legislative determination must be within the constitutional limits of authority— must be in harmony with the Constitution.

How are we to determine the question whether a specific act or ordinance is within the State's police power?

A typical case is that of the City of St. Louis v. Galt, 179 Mo. 8, where this court had under consideration an ordinance requiring owners or occupants to keep lots free from weeds. A lot owner, arrested for violation of the ordinance, claimed that he was raising sunflowers. This court heartlessly classified sunflowers as weeds and held that, *as a matter of common knowledge,* decaying vegetable matter produced disease, and weeds would produce decaying vegetable matter. In that case no specific evidence was offered as to the effect of the weeds grown on the defendant's premises, but this court held the ordinance valid and within the police power of the city, because the effect of the use, which the ordinance was designed to restrict, was a matter of "common knowledge." In that case the defendant claimed that the restriction upon the use of his property was unconstitutional.

In this case we learn, not only as a matter of common knowledge, that the inroad of factories in a residence district would render the residence there uninhabitable, but we have the undenied allegations of the return which conclusively show that. The opinion in the Galt Case states a general rule, where common experience shows that certain uses of property are detrimental to the health and welfare of people in the community. The courts, without resort to evidence, hold that under the police

power certain uses may be restricted, such as livery stables, storage of explosives, incineration plants, slaughterhouses, and the like. Aside from that, if we adhere to the doctrine that we shall not interfere with the legislative determination of the property, expediency or necessity of a legislative act, can we strip the Legislature of all discretion in the matter?

As a matter of "common knowledge" of the harmful effect of certain uses, the courts hold laws for that suppression constitutional. As a matter of common knowledge a multitude of agencies of recent growth threaten the health, safety, welfare, and convenience of the people in a crowded city, just as clearly and imminently as the growth of weeds on a vacant lot, or the maintenance of a slaughterhouse in a busy district.

The city authorities, under legislative grant, have a right to determine the expediency and propriety of measures to protect the people against such dangers, and have in this case ordained a general regulation which, in part, separates factories from residences. The burden is on those who assert it, to prove the regulation would not have that effect, or is unreasonable or oppressive upon those affected by it.

V. The distinction between a general regulation and a specific one cannot be too strongly emphasized. Every general rule of law restricting the liberty of people is necessary, not because every one affected would do harm without such law, but because the general rule prevents violations of the peace. Such are traffic rules which restrict individual liberty and the free use of personal property. Here the city makes a general plan which in a general way would promote the welfare, health and safety of the inhabitants of the city. Some persons affected by the restriction might not work any harm to the community if allowed to violate the restriction, but it is a general law which must apply to everybody if the harm incident to its violation is to be prevented.

General and Specific Regulations.

For these reasons I dissent from the conclusions reached by the majority.