REID, PLAINTIFF-APPELLANT, *v.* ARCHITECTURAL BOARD OF REVIEW OF THE CITY OF CLEVELAND HEIGHTS, DEFENDANT-APPELLEE.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 26233.   Decided July 25, 1963.

*Messrs. Johnson, Weston, Blackmore, Cory & Hurd,* for plaintiff-appellant.

*Mr. King A. Wilmot,* for defendant-appellee.

KOVACHY, P. J.   This is an appeal on questions of law from a judgment rendered by the Court of Common Pleas in favor of the defendant-appellee, The Architectural Board of the City Cleveland Heights, Ohio.

Donna S. Reid, plaintiff-appellant, hereinafter designated applicant, applied to the Building Commissioners of the City of Cleveland Heights for a permit to build a residence on a lot owned by her and her husband on North Park Boulevard in Cleveland Heights.   As required by ordinance, the plans and specifications were referred to the Architectural Board of Review, which Board, after due consideration, made the following order:

"This plan is for a single-story building and is submitted for a site in a multi-story residential neighborhood.   The Board disapproves this project for the reason that it does not maintain the high character of community development in that it does not conform to the character of the houses in the area."

Upon appeal to the Court of Common Pleas, that court rendered a judgment in favor of the Board, holding (1) that the Codified Ordinances were constitutional enactments under the police power of the City; (2) that the Board had the power and authority to render the decision appealed from; (3) that

the Board did not abuse its discretion; and (4) that due process was accorded applicant.

The Board is composed of three architects registered and authorized to practice architecture under Ohio laws with ten years of general practice as such.

Section 137.05 of the Codified Ordinances of the City of Cleveland Heights, titled "Purpose" reads as follows:

"The purposes of the Architectural Board of Review are to protect property on which buildings are constructed or altered, to maintain the high character of community development, and to protect real estate within this City from impairment or destruction of value, by regulating according to proper architectural principles the design, use of materials, finished grade lines and orientation of all new buildings, hereafter erected, and the moving, alteration, improvement, repair, adding to or razing in whole or in part of all existing buildings, and said Board shall exercise its powers and perform its duties for the accomplishment of said purposes only."

This ordinance is intended to:

1. protect property,
2. maintain high character of community development,
3. protect real estate from impairment or destruction of value, and the Board's powers are restricted "for the accomplishment of said purposes only."

These objectives are sought to be accomplished by regulating:

1. design,
2. use of material,
3. finished grade lines,
4. orientation (new buildings).

The Supreme Court of Ohio in paragraph six of the syllabus in the case of *Benjamin* v. *City of Columbus*, 167 Ohio St., 103, 146 N. E. (2d), 854, states:

"Whether an exercise of the police power does bear a real and substantial relation to the public health, safety, morals or general welfare of the public and whether it is unreasonable or arbitrary are questions which are committed in the first instance to the judgment and discretion of the legislative body, and, unless the decisions of such legislative body on those ques-

274

tions appear to be clearly erroneous, the courts will not invalidate them."

The City of Cleveland Heights is a suburb of the City of Cleveland and was organized to provide suitable and comfortable home surroundings for residents employed in Cleveland and its environs. It has no industry or railroads within its confines and is a well-regulated and carefully groomed community, primarily residential in character. An ordinance designed to protect values and to maintain "a high character of community development" is in the public interest and contributes to the general welfare. Moreover, the employment of highly trained personages such as architects for the purpose of applying their knowledge and experience in helping to maintain the high standards of the community is laudable and salutary and serves the public good.

We determine and hold that Ordinance 137.05 is a constitutional exercise of the police power by the City Council and is, therefore, valid.

*State, ex rel. Saveland Park Holding Corp.* v. *Wieland,* 269 Wis., 262, 69 N. W. (2d), 217; *Froelich* v. *City of Cleveland,* 99 Ohio St., 376, 124 N. E., 212; *City of Cincinnati* v. *Correll,* 141 Ohio St., 535, 49 N. E. (2d), 412; 10 Ohio Jurisprudence (2d), 227, 403, 442, Constitutional Law, Sections 152, 325, 366.

Section 137.05, as outlined above, sets out criteria and standards for the Board to follow in passing upon an application for the building of a new home which are definite as to the objective to be attained—to protect property, to maintain high character of community development, to protect real estate from impairment and destruction of value; specific as to matters to be considered and regulated—design, use of material, finished grade lines, orientation; instructive as to the method by which the matters specified are to be adjudged—"proper architectural principles" and informative as to the bounds within which it is to exercise these powers—"for the accomplishment of said purposes only."

When borne in mind that the members of the Board are highly trained experts in the field of architecture, the instruction that they resolve these questions on "proper architectural principles" is profoundly reasonable since such expression has

reference to the basic knowledge on which their profession is founded.

It is our view, therefore, that Section 137.05 contains all the criteria and standards reasonably necessary for the Board to carry on the duties conferred upon it.

In 1 Ohio Jurisprudence (2d), 431, Administrative Law and Procedure, Section 28, it is stated that:

"The discretion conferred on administrative agencies must not be unconfined and vagrant but must be canalized within banks that keep it from overflowing."

We have read the bill of exceptions filed in this case carefully. It discloses that North Park Boulevard is in a district zoned for Class 1A residences not to exceed thirty-five feet in height or two and one-half stories, whichever is lesser, and which are required to cover not less than fifteen thousand square feet of lot space. This district extends through a park area with buildings on the north side and trees, ravines, and bushes hundreds of feet wide on its south side. The buildings on this Boulevard are, in the main, dignified, stately and conventional structures, two and one-half stories high.

The house designed for the applicant, as described by applicant, is a flat-roofed complex of twenty modules, each of which is ten feet high, twelve feet square and arranged in a loosely formed "U" which winds its way through a grove of trees. About sixty per cent of the wall area of the house is glass and opens on an enclosed garden; the rest of the walls are of cement panels. A garage of the same modular construction stands off from the house, and these two structures, with their associated garden walls, trellises and courts, form a series of interior and exterior spaces, all under a canopy of trees and baffled from the street by a garden wall.

A wall ten feet high is part of the front structure of the house and garage and extends all around the garden area. It has no windows. Since the wall is of the same height as the structure of the house, no part of the house can be seen from the street. From all appearances, it is just a high wall with no indication of what is behind it. Not only does the house fail to conform in any manner with the other buildings but presents no identification that it is a structure for people to live in.

The Board, as well as the architect for the applicant, con-

cede that this structure would be a very interesting home placed in a different environment. It is obvious that placed on North Park Boulevard, it would not only be out of keeping with and a radical departure from the structures now standing but would be most detrimental to the further development of the area since there are two vacant lots immediately to the west and a third vacant lot on the street bordering the westernmost lot.

Esthetics was a consideration that played a part in the ruling of the Board, but there were many other factors that influenced its decision. The structure designed is a single-story home in a multi-story neighborhood; it does not conform to general character of other houses; it would affect adjacent homes and three vacant lots; it is of such a radical concept that any design not conforming to the general character of the neighborhood would have to be thereafter approved; when viewed from the street, it could indicate a commercial building; it does not conform to standards of the neighborhood; it does not preserve high character of neighborhood; it does not preserve property values; it would be detrimental to neighborhood on the lot where proposed and it would be detrimental to the future development of the neighborhood.

16 Corpus Juris Secundum, 939, Constitutional Law, Section 195, Esthetic Conditions, states:

"The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, esthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. Nevertheless, it is held that esthetic conditions alone are insufficient to support the invocation of the police power, although if a regulation finds a reasonable justification in serving a generally recognized ground for the exercise of that power, the fact that esthetic considerations play a part in its adoption does not affect its validity."

It is our determination and we hold that the record in this case discloses ample evidence to support the judgment of the trial court that the Board did not abuse its discretion in its decision in this matter.

We conclude, therefore, that no error prejudicial to the

substantial rights of the applicant intervened in the trial of this cause and, consequently, overrule applicant's assignments of error and affirm the judgment.

Judgment affirmed.

Exceptions. Order see journal.

SILBERT, J., concurs.

CORRIGAN, J., dissents.

CORRIGAN, J., dissenting. I regret that I am unable to agree with the decision of my esteemed colleagues in this appeal which is on questions of law from a judgment of the Court of Common Pleas of Cuyahoga County, affirming an order of the Architectural Board of Review of the City of Cleveland Heights which disapproved the issuance to appellant herein of a building permit for a single family residence. The proceedings in the Court of Common Pleas were in the nature of an appeal, under favor of the provisions of Chapter 2506, Revised Code, from the decision of the Board.

To briefly review the factual situation, it appears from the record that on December 18, 1961, appellant completed her application with the plans requesting a building permit for a single proposed family residence to be constructed on a vacant lot on the north side of North Park Boulevard. Pursuant to the applicable ordinances of the City of Cleveland Heights, these plans were presented to the Board for review and consideration. A hearing was had on the application and on February 6, 1962, the Board denied the permit for the reason that the proposed residence "does not maintain the high character of community development in that it does not conform to the character of the houses in the area."

In this dissent it is deemed necessary merely to consider appellant's first assignment of error, namely, that the Board's denial of a permit was contrary to law in that it was based exclusively on an aesthetic consideration. That the Board's determination was based entirely on such a consideration is, to this member of the court, conclusively established by the record before us. Take for example these questions and answers in connection with the interrogation of the witness, Russell Ralph Peck, a registered architect, who is a member of the Board of

278

Architectural Review, at the trial in the Common Pleas Court. It should be remembered that it was stipulated by counsel for both parties that, if the other two members of the Board of Architectural Review would have testified, their testimony would be the same as the testimony of Mr. Peck. It is to be remembered also that both of these other members are likewise registered architects.

"* * *

"Q. Now the Board never took the position that this house would hurt property values along North Park Boulevard, did it?

"A. Our issue was the fact that it was a single story house in a multi-story neighborhood * * *.

"Q. In other words, you were concerned * * *.

"A. * * * *and it did not conform to the aesthetics of the neighborhood.* (Emphasis added.)

"Q. Your objection was grounded upon the appearance of this house and not upon any market value depreciation possibility?

"A. There is no question that the house would be in a class costwise with those in the neighborhood. * * *

"* * *

"Q. The application for the permit was denied solely on the ground that the house did not conform to the character of the other houses along North Park Boulevard; is that correct?

"A. Yes.

"Q. And the application wasn't denied because of any purported or existing violation of technical requirements of the building code?

"A. Oh, no.

"* * *

"Q. At the meeting of January 2nd and February 6th, was there any evidence before the Board that this house, if built, would threaten, endanger or impair the public health or public safety?

"A. No.

"Q. Any evidence before the Board that if that house were built it would adversely affect the public welfare, Mr. Peck?

"A. It might affect public opinion.

"Q. Might affect public opinion?

"A. Yes, but not welfare.
"Q. But not welfare?
"A. Yes.
"* * *

"Q. How are the other houses affected, sir?
"A. By the fact that this house did not conform to the multi-story designs of the houses in the neighborhood.
"* * *

"Q. In other words, you can't tell us what practical effect this house would have on the other houses or any other house in that neighborhood?
"A. From a value standpoint, it probably would be as valuable dollar-wise.
"* * *

"Q. I take it from what you say that the Board's essential concern was with the appearance of this house from the outside?
"A. Exactly.
"Q. The Board wasn't concerned with the architectural treatment of the interior?
"A. No.
"Q. Its sole consideration was the exterior appearance; is that right?
"A. Yes, sir.
"* * *

"A. We don't like the appearance of that house in this neighborhood."

One of the sixteen stipulations entered into between the parties in the trial court was to the effect that neither the Zoning Code nor the Building Code of the Codified Ordinances of the City of Cleveland Heights establishes a minimum height in terms of stories or of feet to which residences must conform.

Another stipulation between the parties was that Architect Kelly's design for the appellant's proposed home satisfies the Cleveland Heights Zoning and Building Code requirements as to size, height, mass and setback.

Further, it was stipulated that most residences in the City of Cleveland Heights were built prior to World War II.

Therefore, the question presented under this assignment of error is: does the Board have the right to prohibit a citizen

from building a house that does not conform to the other houses in the neighborhod, as Mr. Peck testified, supra, or in other words, on aesthetic considerations alone, where the design and plans of such house meet the zoning and building code requirements and will not threaten, endanger or impair the public health, safety or welfare, and will not impair property values in the neighborhood?

This member of the court is of the opinion that the answer is an emphatic negative in the light of the law that is applicable to the situation.

First, to take up the decision of the Board: what answers do the evidence provide as to "the character of the houses in the area," as stated in the Board's decision. North Park Boulevard is an important motor vehicle thoroughfare running generally east and west. On the south side of the boulevard, there is a park area. There are no sidewalks on either side of the boulevard in the block, at least, where appellant's site is located. The homes along North Park Boulevard show examples of Tudor, flat-roofed, contemporary or modern, Spanish Colonial, and other types. Some are two and one-half or three storied homes. The plaintiff's lot abuts to the north on the south end of lots on Colchester Road. This latter street on both sides presents a prosaic succession of two family homes, some of brick construction, some of wood, and some of a combination of both, all of two and one-half stories in height. Two lots west of the plaintiff's property and clearly within view from her lot are the modest frame single homes of two stories on both sides of Woodmere Drive. So here in one small area in Cleveland Heights we find a melange of architectural styles and of obviously varying lot sizes and price values. Then the question occurs as to what is the "character of the houses in the area." A fair definition would appear to consider "character" as the sum of qualities or features by which the area is distinguished from others or a sum of traits conferring distinctiveness. But, is their any distinctiveness to this area? It seems to reflect the result observable in any American suburb of the age of Cleveland Heights with localities of residences constituted of a mixture of architectural designs and of varying price values, most of which were obviously constructed at least from twenty five to forty years

ago. This is not the new suburbia, the packaged villages that are becoming the barracks of the new generation.

The residence proposed to be constructed on her lot by appellant does have character, in the opinion of this member of the court, judging from the description of the plans given by the architect and the model of the proposed construction introduced as an exhibit. It does have attributes conferring distinctiveness. It is one story with a flat roof. But there are other one story modern homes on North Park Boulevard with flat roofs. The plans include a wall to be built at the setback line, 106 feet from North Park Boulevard, approximately seven feet high with walls describing irregular courses on the easterly and westerly sides and a wall on the north line. If appellant does not wish to be bothered with a view of the 'round the clock' vehicular traffic swishing past on North Park Boulevard to and from the marts of trade, she should be permitted this peace. If she wishes to screen out the view of the neighboring mixture of architectural styles and enjoy her trees and garden and other beauties of nature and whatever decoration she introduces within her walls and her home, these should be permitted to her. She feels that the plan submitted calls for a residence of beauty and utility and so does her architect.

It should be borne in mind that there is an important principle of eclecticism in architecture which implies freedom on the part of the architect or client or both to choose among the styles of the past and present that which seems to them most appropriate.

Should the appellant be required to sacrifice her choice of architectural plan for her property under the official municipal juggernaut of conformity in this case? Should her aesthetic sensibilities in connection with her selection of design for her proposed home be stifled because of the apparent belief in this community of the group as a source of creativity? Is she to sublimate herself in this group and suffer the frustration of individual creative aspirations? Is her artistic spirit to be imprisoned by the apparent beneficence of community life in Cleveland Heights? This member of the court thinks not under the record in this case and the pertinent legal principles applicable thereto.

The proposition that the regulatory powers of a munici-

pality cannot be exercised for purely aesthetic reasons unrelated to the requirements of public health, safety or welfare is well settled in Ohio.

*Wondrak* v. *Kelley*, 129 Ohio St., 268, 195 N. E., 65 (1935); *Pritz* v. *Messer et al.*, 112 Ohio St., 628, 149 N. E., 30 (1925); *City of Youngstown* v. *Kahn Bros. Building Co.*, 112 Ohio St., 654, 148 N. E., 842 (1925); *State, ex rel. Srigley,* v. *Woodworth,* 33 Ohio App., 406, 169 N. E., 713 (1929); *Peebles* v. *State,* 25 Ohio Law Abs., 545 (1937).

Accordingly, the Board's disapproval of the issuance of a permit for aesthetic reasons alone is contrary to law and the claim of error is well taken.

For these reasons, it is my view that the judgment of the Court of Common Pleas should be reversed and the cause remanded with instructions to return the cause to the Board of Architectural Review of Cleveland Heights directing that body to approve the issuance of a building permit to appellant.