**STATE of Missouri ex rel. Dimiter STOY-ANOFF and Joan T. Stoyanoff, his wife, Respondents,**

v.

**Robert BERKELEY, Building Commissioner, City of Ladue, Missouri, Appellant.**

No. 54911.

Supreme Court of Missouri, Division No. 2.

Sept. 14, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 12, 1970.

Cupples, Cooper & Haller, Ronald L. Cupples, Gary H. Sokolik, Clayton, for (relators) respondents.

Willson, Cunningham & McClellan, J. H. Cunningham, Jr., St. Louis, for appellant.

PRITCHARD, Commissioner.

Upon summary judgment the trial court issued a peremptory writ of mandamus to compel appellant to issue a residential building permit to respondents. The trial court's judgment is that the below-mentioned ordinances are violative of Section 10, Article I of the Constitution of Missouri, 1945, V.A.M.S., in that restrictions placed by the ordinances on the use of property deprive the owners of their property without due process of law. Relators' petition pleads that they applied to appellant Building Commissioner for a building permit to allow them to construct a single family residence in the City of Ladue, and that plans and specifications were submitted for the proposed residence, which was unusual in design, "but complied with all existing building and zoning regulations and ordinances of the City of Ladue, Missouri."

It is further pleaded that relators were refused a building permit for the construction of their proposed residence upon the ground that the permit was not approved by the Architectural Board of the City of Ladue. Ordinance 131, as amended by Ordinance 281 of that city, purports to set up an Architectural Board to approve plans and specifications for buildings and structures erected within the city and in a preamble to "conform to certain minimum architectural standards of appearance and conformity with surrounding structures, and that unsightly, grotesque and unsuitable structures, detrimental to the stability of value and the welfare of surrounding

property, structures and residents, and to the general welfare and happiness of the community, be avoided, and that appropriate standards of beauty and conformity be fostered and encouraged." It is asserted in the petition that the ordinances are invalid, illegal and void, "are unconstitutional in that they are vague and provide no standard nor uniform rule by which to guide the architectural board," that the city acted in excess of statutory powers (§ 89.020, RSMo 1959, V.A.M.S.) in enacting the ordinances, which "attempt to allow respondent to impose aesthetic standards for buildings in the City of Ladue, and are in excess of the powers granted the City of Ladue by said statute."

Relators filed a motion for summary judgment and affidavits were filed in opposition thereto. Richard D. Shelton, Mayor of the City of Ladue, deponed that the facts in appellant's answer were true and correct, as here pertinent: that the City of Ladue constitutes one of the finer suburban residential areas of Metropolitan St. Louis, the homes therein are considerably more expensive than in cities of comparable size, being homes on lots from three fourths of an acre to three or more acres each; that a zoning ordinance was enacted by the city regulating the height, number of stories, size of buildings, percentage of lot occupancy, yard sizes, and the location and use of buildings and land for trade, industry, residence and other purposes; that the zoning regulations were made in accordance with a comprehensive plan "designed to promote the health and general welfare of the residents of the City of Ladue," which in furtherance of said objectives duly enacted said Ordinances numbered 131 and 281. Appellant also asserted in his answer that these ordinances were a reasonable exercise of the city's governmental, legislative and police powers, as determined by its legislative body, and as stated in the above-quoted preamble to the ordinances. It is then pleaded that relators' description of their proposed residence as " 'unusual in design' is the understatement of the year. It is in

fact a monstrosity of grotesque design, which would seriously impair the value of property in the neighborhood."

The affidavit of Harold C. Simon, a developer of residential subdivisions in St. Louis County, is that he is familiar with relators' lot upon which they seek to build a house, and with the surrounding houses in the neighborhood; that the houses therein existent are virtually all two-story houses of conventional architectural design, such as Colonial, French Provincial or English; and that the house which relators propose to construct is of ultra-modern design which would clash with and not be in conformity with any other house in the entire neighborhood. It is Mr. Simon's opinion that the design and appearance of relators' proposed residence would have a substantial adverse effect upon the market values of other residential property in the neighborhood, such average market value ranging from $60,000 to $85,000 each.

As a part of the affidavit of Russell H. Riley, consultant for the city planning and engineering firm of Harland Bartholomew & Associates, photographic exhibits of homes surrounding relators' lot were attached. To the south is the conventional frame residence of Mrs. T. R. Collins. To the west is the Colonial two-story frame house of the Lewis family. To the northeast is the large brick English Tudor home of Mrs. Elmer Hubbs. Immediately to the north are the large Colonial homes of Mr. Alex Cornwall and Mr. L. Peter Wetzel. In substance Mr. Riley went on to say that the City of Ladue is one of the finer residential suburbs in the St. Louis area with a minimum of commercial or industrial usage. The development of residences in the city has been primarily by private subdivisions, usually with one main lane or drive leading therein (such as Lorenzo Road Subdivision which runs north off of Ladue Road in which relators' lot is located). The homes are considerably more expensive than average homes found in a city of comparable size. The ordi-

nance which has been adopted by the City of Ladue is typical of those which have been adopted by a number of suburban cities in St. Louis County and in similar cities throughout the United States, the need therefor being based upon the protection of existing property values by preventing the construction of houses that are in complete conflict with the general type of houses in a given area. The intrusion into this neighborhood of relators' unusual, grotesque and nonconforming structure would have a substantial adverse effect on market values of other homes in the immediate area. According to Mr. Riley the standards of Ordinance 131, as amended by Ordinance 281, are usually and customarily applied in city planning work and are: "(1) whether the proposed house meets the customary architectural requirements in appearance and design for a house of the particular type which is proposed (whether it be Colonial, Tudor English, French Provincial, or Modern), (2) whether the proposed house is in general conformity with the style and design of surrounding structures, and (3) whether the proposed house lends itself to the proper architectural development of the City; and that in applying said standards the Architectural Board and its Chairman are to determine whether the proposed house will have an adverse affect on the stability of values in the surrounding area."

Photographic exhibits of relators' proposed residence were also attached to Mr. Riley's affidavit. They show the residence to be of a pyramid shape, with a flat top, and with triangular shaped windows or doors at one or more corners.

■ Although appellant has briefed the point that it is a constitutional exercise of the police power for the Legislature to authorize cities to enact zoning ordinances, it is apparent that relators do not contest that issue. Rather, relators' position is that "the creation by the City of Ladue of an architectural board for the purpose of promoting and maintaining 'general conformi-

ty with the style and design of surrounding structures' is totally unauthorized by our Enabling Statute." (§§ 89.020, 89.040, RSMo 1959, V.A.M.S.) It is further contended by relators that Ordinances 131 and 281 are invalid and unconstitutional as being an unreasonable and arbitrary exercise of the police power (as based entirely on aesthetic values); and that the same are invalid as an unlawful delegation of legislative powers (to the Architectural Board).

Section 89.020 provides: "For the purpose of promoting health, safety, morals or the general welfare of the community, the legislative body of all cities, towns, and villages is hereby empowered to regulate and restrict the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, the preservation of features of historical significance, and the location and use of buildings, structures and land for trade, industry, residence or other purposes." Section 89.040 provides: "Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health *and the general welfare;* to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to preserve features of historical significance; to facilitate the adequate provision of transportation, water, sewerage, schools, parks, and other public requirements. *Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the values of buildings and encouraging the most appropriate use of land throughout such municipality."* (Italics added.)

Relators say that "Neither Sections 89.-020 or 89.040 nor any other provision of Chapter 89 mentions or gives a city the au-

thority to regulate architectural design and appearance. There exists no provision providing for an architectural board and no entity even remotely resembling such a board is mentioned under the enabling legislation." Relators conclude that the City of Ladue lacked any power to adopt Ordinance 131 as amended by Ordinance 281 "and its intrusion into this area is wholly unwarranted and without sanction in the law." As to this aspect of the appeal relators rely upon the 1961 decision of State ex rel. Magidson v. Henze, Mo.App., 342 S.W.2d 261. That case had the identical question presented. An Architectural Control Commission was set up by an ordinance of the City of University City. In its report to the Building Commissioner, the Architectural Control Commission disapproved the Magidson application for permits to build four houses. It was commented that the proposed houses did not provide for the minimum number of square feet, and "In considering the existing character of this neighborhood, the Commission is of the opinion that houses of the character proposed in these plans are not in harmony with and will not contribute to nor protect the general welfare of this neighborhood" (loc. cit. 264). The court held that § 89.-020, RSMo 1949, V.A.M.S., does not grant to the city the right to impose upon the landowner aesthetic standards for the buildings he chooses to erect.

As is clear from the affidavits and attached exhibits, the City of Ladue is an area composed principally of residences of the general types of Colonial, French Provincial and English Tudor. The city has a comprehensive plan of zoning to maintain the general character of buildings therein. The Magidson case, supra, did not consider the effect of § 89.040, supra, and the italicized portion relating to the character of the district, its suitability for particular uses, and the conservation of the values of buildings therein. These considerations, sanctioned by statute, are directly related to the general welfare of the community. That proposition has support in a number of cases cited by appellant. State ex rel.

Carter v. Harper, Building Commissioner, 182 Wis. 148, 196 N.W. 451, 454, quotes Chicago B. & Q. Ry. Co. v. People of State of Illinois ex rel. Drainage Commissioners, 200 U.S. 561, 26 S.Ct. 341, 50 L.Ed. 596, 609, "'We hold that the police power of a state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety.'" In Marrs v. City of Oxford (D.C.D.Kan.) 24 F.2d 541, 548, it was said, "The stabilizing of property values, and giving some assurance to the public that, if property is purchased in a residential district, its value as such will be preserved, is probably the most cogent reason back of zoning ordinances." See also People v. Calvar Corporation et al., Sup., 69 N.Y.S.2d 272, 279 (aff'd 286 N. Y. 419, 36 N.E.2d 644); Kovacs v. Cooper, Judge, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513, 526; Wulfsohn v. Burden, 241 N.Y. 288, 150 N.E. 120, 122 [3], 43 A.L.R. 651; and Price et al. v. Schwafel (Cal.), 92 Cal. App.2d 77, 206 P.2d 683, 685. The preamble to Ordinance 131, quoted above in part, demonstrates that its purpose is to conform to the dictates of § 89.040, with reference to preserving values of property by zoning procedure and restrictions on the use of property. This is an illustration of what was referred to in Deimeke v. State Highway Commission, Mo., 444 S.W.2d 480, 484, as a growing number of cases recognizing a change in the scope of the term "general welfare." In the Deimeke case on the same page it is said, "Property use which offends sensibilities and debases property values affects not only the adjoining property owners in that vicinity but the general public as well because when such property values are destroyed or seriously impaired, the tax base of the community is affected and the public suffers economically as a result."

■ Relators say further that Ordinances 131 and 281 are invalid and unconstitutional as being an unreasonable and arbitrary exercise of the police power. It is

argued that a mere reading of these ordinances shows that they are based entirely on aesthetic factors in that the stated purpose of the Architectural Board is to maintain "conformity with surrounding structures" and to assure that structures "conform to certain minimum architectural standards of appearance." The argument ignores the further provisos in the ordinance: " * * * and that unsightly, grotesque and unsuitable structures, *detrimental to the stability of value and the welfare of surrounding property, structures, and residents*, and *to the general welfare and happiness of the community*, be avoided, and that appropriate standards of beauty and conformity be fostered and encouraged." (Italics added.) Relators' proposed residence does not descend to the " 'patently offensive character of vehicle graveyards in close proximity to such highways' " referred to in the Deimeke case, supra (444 S.W.2d 484). Nevertheless, the aesthetic factor to be taken into account by the Architectural Board is not to be considered alone. Along with that inherent factor is the effect that the proposed residence would have upon the property values in the area. In this time of burgeoning urban areas, congested with people and structures, it is certainly in keeping with the ultimate ideal of general welfare that the Architectural Board, in its function, preserve and protect existing areas in which structures of a general conformity of architecture have been erected. The area under consideration is clearly, from the record, a fashionable one. In State ex rel. Civello v. City of New Orleans, 154 La. 271, 97 So. 440, 444, the court said, "If by the term 'aesthetic considerations' is meant a regard merely for outward appearances, for good taste in the matter of the beauty of the neighborhood itself, we do not observe any substantial reason for saying that such a consideration is not a matter of general welfare. The beauty of a fashionable residence neighborhood in a city is for the comfort and happiness of the residents, and it sustains in a general way the value of property in the neighborhood." See also

People v. Stover, 12 N.Y.2d 462, 240 N.Y.S. 2d 734, 191 N.E.2d 272, 274 [3]; State ex rel. Saveland Park Holding Corp. v. Wieland, 269 Wis. 262, 69 N.W.2d 217, 222; Reid v. Architectural Board of Review of the City of Cleveland Heights, 119 Ohio App. 67, 192 N.E.2d 74, 77; and Oregon City v. Hartke, 240 Or. 35, 400 P.2d 255, 261, for pronouncements of the principle that aesthetics is a factor to be considered in zoning matters.

In the matter of enacting zoning ordinances and the procedures for determining whether any certain proposed structure or use is in compliance with or offends the basic ordinance, it is well settled that courts will not substitute their judgments for the city's legislative body, if the result is not oppressive, arbitrary or unreasonable and does not infringe upon a valid pre-existing nonconforming use. Landau et al. v. Levin, 358 Mo. 77, 213 S.W.2d 483, 485 [2–4]; Flora Realty & Investment Co. v. City of Ladue, 362 Mo. 1025, 246 S.W.2d 771, 777 [1]; Wrigley Properties, Inc. et al. v. City of Ladue, Mo., 369 S.W.2d 397, 400 [2–4]. The denial by appellant of a building permit for relators' highly modernistic residence in this area where traditional Colonial, French Provincial and English Tudor styles of architecture are erected does not appear to be arbitrary and unreasonable when the basic purpose to be served is that of the general welfare of persons in the entire community.

In addition to the above-stated purpose in the preamble to Ordinance 131, it establishes an Architectural Board of three members, all of whom must be architects. Meetings of the Board are to be open to the public, and every application for a building permit, except those not affecting the outward appearance of a building, shall be submitted to the Board along with plans, elevations, detail drawings and specifications, before being approved by the Building Commissioner. The Chairman of the Board shall examine the application to determine if it conforms to proper architectural standards in appearance and design and will be

in general conformity with the style and design of surrounding structures and conducive to the proper architectural development of the city. If he so finds, he approves and returns the application to the Building Commissioner. If he does not find conformity, or has doubt, a full meeting of the Board is called, with notice of the time and place thereof given to the applicant. The Board shall disapprove the application if it determines the proposed structure will constitute an unsightly, grotesque or unsuitable structure in appearance, detrimental to the welfare of surrounding property or residents. If it cannot make that decision, the application shall be returned to the Building Commissioner either with or without suggestions or recommendations, and if that is done without disapproval, the Building Commissioner may issue the permit. If the Board's disapproval is given and the applicant refuses to comply with recommendations, the Building Commissioner shall refuse the permit. Thereafter provisions are made for an appeal to the Council of the city for review of the decision of the Architectural Board. Ordinance 281 amends Ordinance 131 only with respect to the application initially being submitted to and considered by all members of the Architectural Board.

◼ Relators claim that the above provisions of the ordinance amount to an unconstitutional delegation of power by the city to the Architectural Board. It is argued that the Board cannot be given the power to determine what is unsightly and grotesque and that the standards, "whether the proposed structure will conform to proper architectural standards in appearance and design, and will be in general conformity with the style and design of surrounding structures and conducive to the proper architectural development of the City * * *" and "the Board shall disapprove the application if it determines that the proposed structure will constitute an unsightly, grotesque or unsuitable structure in appearance, detrimental to the welfare of surrounding property or residents * *,"

are inadequate. First cited is State ex rel. Continental Oil Company v. Waddill, Mo., 318 S.W.2d 281, which held an ordinance provision unconstitutional which clothed the City Planning Committee with arbitrary discretion without a definite standard or rule for its guidance, following the general rule in Lux v. Milwaukee Mechanics' Ins. Co., 322 Mo. 342, 15 S.W.2d 343, 345. In the Lux case, as well as in State ex rel. Ludlow v. Guffey, Mo., 306 S.W.2d 552, exceptions to the general rule were stated to be "in situations and circumstances where necessity would require the vesting of discretion in the officer charged with the enforcement of an ordinance, as where it would be either impracticable or impossible to fix a definite rule or standard, or where the discretion vested in the officer relates to the enforcement of a police regulation requiring prompt exercise of judgment" (306 S.W.2d 557). The ordinance here is similar to the ordinance in the Guffey case wherein it was held that general standards of the ordinance were sufficient. Although it was said that neither of the above-stated exceptions applied in the Guffey case, the impracticality of setting forth a completely comprehensive standard insuring uniform discretionary action by the city council was discussed. It was held that the general standards were sufficient and that the procedure for determining whether the proposed filling station would or would not promote the "health, safety, morals or general welfare of the community" or would or would not adversely affect "the character of the neighborhood, traffic conditions, public utility facilities and other matters pertaining to the general welfare" (306 S.W.2d 558) was sufficient to provide against the exercise of arbitrary and uncontrolled discretion by the city council. Here, as in the Guffey case, the procedures are for public hearings with notice to the applicant, not only by the Architectural Board but also by the City Council on appeal on the factual issues to be determined under the ordinance. An applicant's rights are safeguarded in this respect, and thus distinguished is the ordinance which was con-

demned in State ex rel. Magidson v. Henze, supra. Otherwise, in the respect that the Magidson case did not consider the purpose of § 89.040, supra, it should no longer be followed. Ordinances 131 and 281 are sufficient in their general standards calling for a factual determination of the suitability of any proposed structure with reference to the character of the surrounding neighborhood and to the determination of any adverse effect on the general welfare and preservation of property values of the community. Like holdings were made involving Architectural Board ordinances in State ex rel. Saveland Park Holding Corp. v. Wieland, 269 Wis. 262, 69 N.W.2d 217, and Reid v. Architectural Board of Review of the City of Cleveland Heights, 119 Ohio App. 67, 192 N.E.2d 74, supra.

The judgment is reversed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

DONNELLY, P. J., MORGAN and FINCH, JJ., and JENSEN, Special Judge, concur.