**CITY OF INDEPENDENCE,**
Missouri, Respondent,

v.

Leora **RICHARDS**, Appellant.

No. WD 34,211.

Missouri Court of Appeals,
Western District.

Nov. 29, 1983.

Motion For Rehearing and/or Transfer to
Supreme Court Overruled and Denied
Jan. 31, 1984.

Rufus Burrus, W. Raleigh Gough, Independence, for appellant.

J. Scott King, Asst. City Counselor, Independence, for respondent.

Before SOMERVILLE, P.J., and SHANGLER and MANFORD, JJ.

SHANGLER, Judge.

The defendant Richards was convicted for the infraction of City of Independence ordinance number: Chapter 7, Article 2, § 7.140 and assessed a fine under penal § 7.230. The cause was heard de novo in the circuit court, the infraction was found anew and a $250 fine imposed.

Ordinance § 7.140 provides:

It shall be unlawful for any person owning or occupying any premises within the City *to permit refuse to accumulate or remain* upon such premises to an extent or *in such manner as to be unsightly, annoying,* dangerous or detrimental to the life, health, property or safety of any person in the City. [emphasis added]

The complaint [1] alleged that on October 1, 1981, the defendant Richards did wilfully and unlawfully

*"permit refuse* namely: an old stove with pots and cans scattered on the ground *to accumulate* on the outside of her premises at 8900 Thompson *in such a manner as to be unsightly and an annoyance* to other persons in the City ...." [emphasis added]

 The defendant acknowledges that, in the exercise of the police power, an ordinance may regulate private property to protect the general welfare. [*See Bellerive Investment Co. v. Kansas City,* 321 Mo. 969, 13 S.W.2d 628, 633, 634[1] (1929)].

Thus, she concedes that the proscription of § 7.140 against the accumulation of refuse on private property in such manner as to pose a danger to the life, health, or safety of others legislates a valid municipal purpose. She contends, however, that the ordinance component which interdicts an accumulation of trash *unsightly* or *annoying* merely, but not to prevent a *danger* to the public, legislates esthetics and not the police power. The police power extends to conditions which bear a substantial relation to the public health, morality, safety or welfare. *State v. McKelvey,* 301 Mo. 1, 256 S.W. 474, 477 (banc 1923); C. Antieau, Municipal Corporation Law § 6.00 (1983). There is no precondition that the legislation always protect against a public *danger. Ex Parte Williams,* 345 Mo. 1121, 139 S.W.2d 485 (Mo.1940). That the ordinance is cast in terms of *danger* does not diminish its effect as an enactment of the plenary police power—to advance the general welfare. That is to say: an express reference by the text that the enactment is for the protection of the health, safety, morality and welfare of the public is unnecessary where the fact of the ordinance discloses that purpose. *Bellerive Investment Co. v. Kansas City,* 321 Mo. 969, 13 S.W.2d 628, 634[2–4] (1929). The question the appeal poses, therefore, is whether the municipal regulation of private property for *unsightliness* only relates to the police power— that is: whether esthetic values impinge upon the public health, morality, safety or welfare.

 It remains open whether our law tends to recognize esthetics as an independent basis for the exercise of the police power.[2] The early decisions confirmed the

---

1. The complaint, prosecution and conviction which we sustain in *City of Independence v. Richards,* 659 S.W.2d 795 (Mo.App.1983), adopted concurrently, relates to the same property and alleges infraction on October 1, 1981. The complaint against Richards in this related case alleges infraction on October 1, 1981, but both prosecutions were brought on October 12, 1982.

2. The police power, in the broadest sense, encompasses every regulation—and hence restriction—on the use of private property. In this inclusive sense, the act of eminent domain is merely another, albeit quite distinctive, exercise of the police power. *State ex rel. Penrose Investment Co. v. McKelvey,* 301 Mo. 1, 256 S.W. 474, 478 (banc 1923). The distinction between the two exercises, however, must be drawn and observed. The police power—in the more usual and parochial sense, the noneminent domain

common law principle that only a palpable benefit to the general welfare could justify the police power to interfere with the enjoyment of private property. *State v. McKelvey*, 301 Mo. 1, 256 S.W. 474, 477 (banc 1923). Thus, a statute [The Boulevard Law] which enabled a city with an enumerated population to establish a building line on a boulevard to which all appurtenant structures must conform was deemed a confiscation of private property and not a mere regulation under the police power, notwithstanding the declared purpose of the enactment was as a traffic control. *City of St. Louis v. Hill*, 116 Mo. 527, 22 S.W. 861, 862–863 (1893). In that early climate of opinion, regulation based on esthetic consideration was neither a purpose encompassed within the police power "no[r] in accord with the spirit of our democratic institutions." *City of St. Louis v. Evraiff*, 301 Mo. 231, 256 S.W. 489, 495[2–5] (banc 1923). Thus, an ordinance to regulate the dimensions and placement of outdoor advertisement signs to protect against their use as private privies and as places of refuge for criminals was a valid exercise of the police power—but not to ensure against unsightliness. *St. Louis Gunning Advertisement Co. v. City of St. Louis*, 235 Mo. 99, 137 S.W. 929, 961 (1911).

That tenor of opinion gave way—with only intermittent relapse—to an emergent public awareness that an unsightly environment impinges adversely on human sensi-bility and to a concomitant readiness of legislatures to accommodate that value as an element of the general welfare, and hence as a proper subject for the exercise of the police power. Thus, in *Deimeke v. State Highway Commission*, 444 S.W.2d 480 (Mo.1969), our Supreme Court upheld the validity of a junkyard control statute as an exercise of the police power. In the course of opinion, the court acknowledged the newly evolved doctrine and explained the rationale [l.c. 483–484]:

> [E]arlier Missouri cases stated that aesthetic considerations alone would not justify exercise of the police power, although such factors might be considered along with other things relating to health, safety or morals ... Similar views prevailed in many states, although it was arguable that in some of the cases the predominant reason for the regulation was in fact aesthetic. However, more recently a growing number of cases have recognized a change in the scope of the term "general welfare," ... In this connection, the recent experiences of our nation, particularly in the urban areas, indicate that offensive and unsightly conditions do have an adverse effect on people and that beauty and attractive surroundings are important factors in the lives of the public. The general welfare is promoted by action to insure the presence of such attractive surroundings.

sense—restricts the use of private property without compensation. The justification is the public welfare, or good. *St. Louis Gunning Advertising Co. v. City of St. Louis*, 235 Mo. 99, 137 S.W. 929, 946 (banc 1911). In eminent domain, on the other hand, damages are paid, and the public need for the use, rather than the public good, is the desideratum to justify action. *City of Kansas City v. Kindle*, 446 S.W.2d 807, 813 (Mo.1969). The preservation of natural scenic beauty of highways has been established as an independent basis for the exercise of the eminent domain police power by § 226.500, RSMo 1980 of the Billboards Act. The provisions of the Act compensate non-conforming owners in order to accomplish the esthetic purpose of the legislation. §§ 226.550 and 226.570. *See also* Missouri Local Government Law § 5.18 (The Missouri Bar 1975). It is also established law that once the police power of eminent domain is exercised, even if not for purposes distinctively esthetic, that resultant unsightliness constitutes an element of damages for which compensation must be made. *Missouri Public Service Company v. Garrison*, 454 S.W.2d 628, 629 (Mo.App. 1969); *Kamo Electric Cooperative, Inc. v. Cushard*, 416 S.W.2d 646, 654[5, 6] (Mo.App.1967).

It may be that where the police power must compensate—as in eminent domain—the restriction on the use of the property to ensure a visual value is thought less intrusive because the reward is more palpable than when an ordinance seeks the same end, but for the public good merely, and hence without compensation. The logic of that disequivalence is open to question. *See Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); *City of Phoenix v. Fehlner*, 90 Ariz. 13, 363 P.2d 607, 609[2] (banc 1961); *Oregon City v. Hartke*, 240 Or. 35, 400 P.2d 255, 262[12, 13] (banc 1965).

The court found also that the appearance of property affects not only its own value but that of property in the environs as well. *Id.* at 484. Then, in *State ex rel. Stoyanoff v. Berkeley,* 458 S.W.2d 305 (Mo.1970), an ordinance to create an architectural board with power to regulate building design to promote a conformity of sightliness among structures was sustained as a valid exercise of the police power against the contention that the regulation rested on a purely esthetic consideration. The *Stoyanoff* court responded [l.c. 309] with *Deimeke* that property use which offends visual sensibility also debases property values and so an ordinance which protects against unsightliness is a valid exercise of the police power. That rationale was iterated in *State ex rel. Wilkerson v. Murray,* 471 S.W.2d 460 (Mo.1971), to validate an ordinance which defined *single family dwelling* so as to exclude trailers and mobile homes from a residential area.

These decisions approve a police power exercise to protect against structural unsightliness on the rationale that such a visual blight, when become permanent, necessarily debases the value of property in the environs, and so affects the general welfare. The augury and implicit premise of these decisions—as *Deimeke* and *Stoyanoff* show—is that esthetic consideration alone suffices for the exercise of the police power. That does not introduce a new public policy. The Missouri Constitution empowers the legislature to preserve scenic beauty. [Mo. Const. Art. III, § 48]. The Billboards Act [§§ 226.500–226.600 RSMo (1978)] regulates outdoor advertisements in order "to preserve the natural scenic beauty of highways and adjacent areas"—albeit, not as an exercise of the police power, but to conform to federal standards. That augury comports with the early declaration by the United States Supreme Court in *Berman v. Parker,* 348 U.S. 26, l.c. 33, 75 S.Ct. 98, l.c. 102, 99 L.Ed. 27 (1954) that:

"The concept of the public welfare is broad and inclusive ... [t]he values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean ...."

[That same court later, but more definitively, reaffirmed the right of states and municipalities to preserve, through the police power, structures of esthetic significance as well as the esthetic character of a city as an enhancement of the quality of life. *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)]. It comports also with the views of the majority of jurisdictions. Steinbach, *Aesthetic Zoning: Property Values and the Judicial Decision Process,* 35 Mo.L.Rev. 176 (1970). We need not and do not determine, however, whether the augury we discern [that the Missouri decisions tend to the principle that esthetic consideration alone suffices for the exercise of the police power] has come to pass.[3]

The reluctance of the courts to sanction esthetic controls was prompted as much by the difficulty to articulate an objective standard as by the lack of an evolved cultural ethos. The court in *St. Louis Gunning Advertisement Co. v. City of St. Louis,* supra, saw such a regulation as merely one set of tastes opposed to another [l.c. 137 S.W. 961–962]:

A statute or ordinance conforming to the tastes and ideas of beauty passed by the body of lawmakers who enact it might and probably would in most instances be distasteful to a majority of the people of the city; and especially is that true as regards this class of legislation. The matters which would most likely be the subjects to this class of legislation are, as a rule, more pleasing to those who are far removed therefrom than they are to those who reside near them and who are subjected to their annoyance and inconvenience. In all such cases distance

---

**3.** An excellent compendium of the progression of the law on the subject in the several jurisdictions—Missouri included—is found in Bufford, *Beyond the Eye of the Beholder: A New Majority of Jurisdictions Authorize Aesthetic Regulation,* 48 UMKC L.Rev. 125 (1980).

lends enchantment to the view ... *Property rights should never be subjected to such fickle standards of regulation ....* [emphasis added]

*St. Louis Gunning Advertisement, State ex rel. Magidson v. Henze,* 342 S.W.2d 261 (Mo.App.1961), and the early trend of Missouri cases found, simply, that *esthetics* connoted notions of beauty, individually harbored, and incapable of legislative promulgation. *See also* A. Rathkopf & D. Rathkopf, The Law of Zoning and Planning, § 14.01 (4th ed. 1983).

 The general welfare [as we note] now accommodates the concept, widely held among the populace, that an environment free from unsightliness and other visual intrusion enhances life and is a value the police power will protect. A regulation promulgated under the police power, however, whether to protect an esthetic value or any other objective of the general welfare, must fix the conduct exacted by the ordinance with such certainty that the enforcement will not be left to the unassisted judgment of the policeman, administrator or judicial officer. *Dae v. City of St. Louis,* 596 S.W.2d 454, 457[7, 8] (Mo.App. 1980). The text of the ordinance must be so explicit, moreover, as to constitute a " 'sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.' " *St. Louis County v. McBride & Son, Inc.,* 487 S.W.2d 878, 879[1] (Mo.App.1972) (quoting *State v. Smith,* 431 S.W.2d 74, 78[1, 2] (Mo.1968)). That is to say, that the prohibition of the ordinance must be so certain and definite as to inform those it addresses what conduct will render them liable to penalty and to provide those charged with its administration with a clear standard which operates uniformly and avoids arbitrary enforcement. *State v. Crawford,* 478 S.W.2d 314, 316[2, 7] (Mo.1972); *Morris-*

*town Road Associates v. Mayor & Common Council,* 163 N.J.Super. 58, 394 A.2d 157, 161[1] & [2] (1978). The urgency for an explicit standard is even more imperative where a violation subjects the actor to criminal or quasi-criminal penalty. *Ex Parte Lerner,* 281 Mo. 18, 218 S.W. 331, 333[3, 6] (banc 1920).

 The ordinance we review renders it unlawful—and subjects to penal sanction—any person who occupies a premise within the City of Independence who

"permit[s] refuse to accumulate or remain upon such premises to an extent or in such manner as to be *unsightly, annoying, dangerous* or *detrimental* to the life, health, property or safety of any person in the City." [emphasis added] [Independence, Missouri City Code, ch. 7, art. 2, § 7.140 (1976)]

The complaint alleges that on October 1, 1981, the defendant permitted refuse [described] to

"accumulate on the outside of her premises [described] in such a manner as to be *unsightly* and an *annoyance* to the other persons in the City." [emphasis added]

Thus, the gist of complaint is not that the accumulation of the trash on the owned premises was dangerous or detrimental to life and health—but merely *unsightly* and an *annoyance* to others. These basic criteria of the ordinance—*unsightliness* and *annoyance*—the complaint seeks to enforce are not defined in the enactment.[4] In the absence of ordinance definition, the sense of the terms—to determine the sufficiency of the warning—are measured by "common understanding and practice." *State v. Smith,* 431 S.W.2d 74, 78[1, 2] (Mo.1968).

 The dictionary [Webster's Third New International Dictionary, Unabridged,

---

4. The ordinance does define *trash:* "all organic or inorganic matter, except garbage, which has been discarded, damaged, thrown away or which no longer has value or use, or is inoperative or unworkable."

We assume for purpose of opinion that the definition of *trash* suffices to avoid vagueness

and that the evidence supports the conclusion—essential for violation—that the stove, pots and pans and other matter displayed on the grounds of the premises were "no longer [of] value or use, or [were] inoperative or unworkable." That issue was in serious dispute.

(1961)] defines *unsightly* to mean: "not sightly; not comely ... *syn* see UGLY."[5] What is sightly, or unsightly, comely or not comely—or simply ugly are notions both subjective and qualitative, and convey no "common understanding or practice." *State v. Smith*, supra, l.c. 78[1, 2]; *St. Louis County v. McBride & Son, Inc.*, supra, l.c. 879[1]. In the absence of an explicit definition in the enactment itself, an ordinance which leaves the administrator, policeman or judicial officer free to regulate the property right of another according to harbored notions of comeliness operates arbitrarily and without reasonable prediction. It posits a "fickle standard of regulation" [*St. Louis Gunning Advertisement Co. v. City of St. Louis*, supra, l.c. 137 S.W. 962] and fails the test of certainty and definiteness required of such enactments. Nor does the antecedent term *accumulate* [replicated in the complaint] invest the *unsightly* standard with any more precision. The ordinance gives no definition for the use meant for the term, thus a person affected by the proscription is left to the resort of "common understanding and practice." *State v. Smith*, supra, l.c. 78[1, 2]. The dictionary [Webster's Third New International Dictionary, Unabridged (1961)] defines *accumulate* to mean: "to heap up: to heap up in a mass: pile up: AMASS: COLLECT, GATHER ... *syn* AMASS, HOARD; ACCUMULATE suggests a gradual piling up or increasing so as to make a store or great quantity ...." Thus, the common use of the term *accumulate* conveys a temporal, not an esthetic, dimension. These two ostensibly disparate qualities, nevertheless, come together in the decisions which validate the police power as a means to protect an esthetic value. That is to say, it is not the momentary unsightliness which results from a transitory use of property that the police power prosecutes, but a visual blight of unjustified duration, or one become permanent. That is the sense of *Wilkerson v. Murray*, supra, where the ordinance defined *single family dwelling* so as to

exclude trailers and mobile homes from a residential area. That is also the sense of *Deimeke v. State Highway Commission*, supra, which sustained the statutory regulation to screen junkyards along the highway. That is also the sense of *State ex rel. Stoyanoff v. Berkeley*, supra, which validated as an exercise of the police power an ordinance to regulate through an architectural board the appearance and design of structures to ensure conformance with the style of existent buildings. That is also the rationale which informs statutes, decisions [*Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)] and even our constitutional provision [Mo. Const. Art. III § 48, (1945)] that the preservation of historical buildings and landmarks is a legitimate subject of legislation and of the police power. *See also* Bufford, *Beyond the Eye of the Beholder: A New Majority of Jurisdictions Authorize Aesthetic Regulation*, 48 UMKC L.Rev. 125, 131 et seq. (1980); Brace, *Comment: Urban Aesthetics and the Courts—A Review of Current Judicial Opinions on Community Appearance*, 12 The Urban Lawyer, 151 (1980). Thus, we conclude that not only does the ordinance term *unsightly* not conjure a concept of visual incongruity so generally held that no further definition is required, but even an accumulation of trash *unsightly* by any standard—but only a momentary blight incidental to the normal enjoyment of the property—does not concern the police power. It was that very lack of temporal certainty which prompted the court in *St. Louis County v. McBride*, supra, to declare vague and unenforceable an ordinance which forbade dumping [except for landfills] or *accumulation of trash* on any property. The court first posed the question [l.c. 879[2]]: "Can [under the ordinance] a homeowner store trash on his property between the weekly collections?" It was that uncertainty which rendered the ordinance vague. And so it is here as well that the term *accumulate*, without other

---

5. The same lexicon defines *annoying* to mean: "irritating, vexing." That term is fallible as a

regulatory police power standard for the same reasons our discussion of *unsightly* describes.

definition of duration of the unsightliness, does nothing to allay the uncertainty of the standard the ordinance undertakes to enforce.

 That to avoid vagueness an ordinance which regulates sensory impression needs not only define the proscribed effect with sufficient certainty, but also a duration after which the offensive condition becomes actionable, is confirmed by *Olympic Drive-In Theatre, Inc. v. Pagedale*, 441 S.W.2d 5 (Mo.1969). The ordinance undertook to revoke the license of any drive-in theater [l.c. 7] conducted "so as to constitute a nuisance by reason of noise ... on the premises." The court invalidated the regulation [l.c. 9] as "too vague and indefinite. *It does not set any standards as to how much noise or for how long continued....*" [emphasis added]

 The subject of disagreeable odors, analogous to visual blight and disagreeable sound, needs an equally explicit definition of standard for valid regulation under the police power. In *City of Festus v. Werner*, 656 S.W.2d 286 (Mo.App.1983) the defendant was convicted of the violation of an ordinance which constituted as a nuisance [l.c. 287] "[T]he rendering or heating or steaming of any animal or vegetable product or substance creating or generating noisome, disagreeable or unwholesome smells ...." The court determined that the prohibition of the ordinance against *disagreeable* odors, without textual definition of that term, rendered the ordinance constitutionally vague [l.c. 287]:

" 'to construe this ordinance as attempting to condemn as "offensive" any odor that is disagreeable to, or disliked by, an indefinite number of persons in a given neighborhood would render the legislation void as too vague and indefinite for enforcement, ... or would turn the question of the existence of a nuisance into a plebiscite of the neighborhood and amount to an unlawful delegation of authority.'

"The ordinance here is ... vague. It prohibits the rendering, heating or steaming of *any* animal or vegetable product which creates disagreeable odors. 'Disagreeable' is not defined, nor is any quantum of such odor established as necessary for violation. The ordinance does not provide who shall make the determination of 'disagreeable,' nor provide any standard for making such a determination ... [v]iolation of the ordinance depends on the vagaries of human response to smells and language of the ordinance provides no guide to police, prosecutors, judges or jurors as to the standards to be applied in determining whether a violation has occurred. The ordinance might apply to leaf burning, barbecuing, clam steaming, pipe smoking, or automobile driving if a witness could be found who regarded the odors emanating therefrom as disagreeable.... [T]he ordinance is too vague to be enforceable or constitutional."

The sufficiency of the term *unsightly*, or near synonym, as a standard for a police power ordinance has been the subject of only occasional adjudication in the several jurisdictions, and not at all in our own. In *Morristown Road Associates v. Mayor & Common Council*, 163 N.J.Super. 58, 394 A.2d 157 (1978), an ordinance undertook to establish a standard for design review to foster [l.c. 394 A.2d 158] "good quality of design and *attractive appearance* of property." [emphasis added] The ordinance then promulgated standards for design, preservation of the landscape, and other details to ensure a visual harmony among the structures. The standards promulgated to guide the design review committee and plans board as well as an applicant were in terms of *enhancement of overall appearance, harmonious* colors and materials, *harmonious appearance*, structures *harmonious* with the terrain and existent buildings, and terms of that ilk. The proponent court sustained the contention that the design standards—that a new structure be related *harmoniously* to the terrain and have a *visual relationship* to existent buildings by the use of a design *harmonious* with existent development and *harmonious* materials and colors—vested the de-

sign committee with too much discretion and was void for vagueness. The scheme of the ordinance was that, in those terms of reference, the proposed design was to be rejected if of a [l.c. 394 A.2d 159] "displeasing monotony of design," among other criteria. The court remarked specifically [l.c. 394 A.2d 163]:

"No definition of the terms 'harmonious,' 'displeasing' or 'appropriate' are given in the ordinance. It may be that, regarding architectural design, there are 'concepts of congruity held so widely that they are inseparable from the enjoyment and hence the value of property.' [citation] However, the standards set forth in the present ordinance are not limited to such concepts. The basic criterion for design review under the ordinance is *harmony* with existing structures and terrain. This standard does not adequately circumscribe the process of administrative decision nor does it provide an understandable criterion for judicial review. It vests the design review committee with too broad a discretion, and permits determinations based upon whim, caprice or subjective considerations."

The opinion then culminated in this statement of principle [l.c. 394 A.2d 163]:

"*Harmony of design and appearance is conceptual. A proposal which is considered harmonious and appropriate by one person may be deemed displeasing by another. A standard which permits such evaluations does not meet the test of certainty and definiteness required of zoning ordinances.* [emphasis added].

 So it is with the concept of *unsightly.* It may be that there are concepts of *unsightly* so congruous and held so widely that they are inseparable from the enjoyment of property: but the text of the ordinance we review does not promulgate such a concept. The term goes without definition, nor does the context of the ordinance complete that interstice.

 Of course, an ordinance term, not otherwise defined, may nevertheless be sufficiently explained by the context of the enactment, and so avoid vagueness and preserve validity. *City of Willow Springs v. Missouri State Librarian,* 596 S.W.2d 441, 445[4–6] (Mo. banc 1980).

That was the rationale the court employed, for instance, in *City of Collinsville v. Seiber,* 82 Ill.App.3d 719, 38 Ill.Dec. 75, 403 N.E.2d 90 (1980). The municipality enacted an ordinance declared to be a nuisance, and punished as a misdemeanor, for any person [l.c. 38 Ill.Dec. 76, 403 N.E.2d 91]

"[t]o permit or maintain an *unsightly* yard or premises where there is an *accumulation* or deposit *of* any vehicle, equipment, *junk,* wrecked or disabled automobile, trucks, material of any nature, waste or earth." [emphasis added]

The defendant operated a sanitation service, collected garbage, scrap iron and trash. There was evidence the premises were strewn with disabled vehicles, tires and other parts, a condition which remained unchanged for a month. The defendant contended that the ordinance was overbroad and vague so that the conviction was invalid. He contended also that the junk business was not *per se* a nuisance and that the ordinance, as written, would render its normal conduct impossible. The court responded that the purpose of the ordinance was not to prohibit junk yards but to require all property—even those which accommodated such a business—[l.c. 38 Ill.Dec. 78, 403 N.E.2d 93] "be maintained *in a sanitary manner, ever mindful of the public health and safety.*" [emphasis added] To the specific complaint that the operative terms unsightly and junk were not defined in the ordinance and so rendered that nuisance enactment unconstitutionally vague, the court responded [l.c. 38 Ill.Dec. 79, 403 N.E.2d 94[10]]:

"It is apparent in the present case that the terms used are significantly explained in the context of the ordinance as a whole. *When the entire ordinance* in the case at bar *is read in a sensible way, it is apparent that the finding of a nuisance is not based solely on the 'unsightly' nature of the premises, nor the 'junk' nature of the objects thereon, but*

*also on the 'accumulation or deposit' of the various objects on the open ground,* which would constitute clutter, *a danger to children, and a possible breeding ground for vermin and rodents."* [emphasis added]

Thus, the court discerned the purpose of the ordinance in context [whether from actual provisions of the enactment or otherwise does not appear] was not merely to regulate against *unsightly* property, but to guard the safety of children from the clutter of such objects [as an attractive nuisance?] and to avoid the contagion from vermin and rodents such accumulations breed.

■ The ordinance we review, however, has no such sense of context or ulterior reference to infuse meaning to *unsightly, accumulation,* or other undefined terms. The ordinance undertakes to subject to penalty any person who occupies a premise and "permits refuse to accumulate ... in such manner as to be unsightly ...." There is no precondition that the unsightly condition be a source of danger, or a detriment to the life, health, property or safety of any person. The ordinance terms are in the *disjunctive*—and render actionable an *unsightly* premise, for unsightliness—simpliciter. [They render actionable, quite separately, an accumulation of trash detrimental to life, health, or safety.] The complaint rescripts the disjunctive ground of the ordinance: that the defendant allowed "to accumulate on the outside of her premises ... in such a manner as to be unsightly, ..." and the penalty was for that violation. The prosecutor concedes that the ordinance clause the complaint undertakes to enforce has no motive other than to regulate against *unsightly* use of property—that breach of the public safety was neither charged nor at stake.

■ The term *unsightly,* we iterate and conclude, in the absence of definition, does not suffice as a standard of regulation. It conveys no determinable criterion, but rather invites the vagary of personal response. Nor does the context of the ordinance supply what otherwise lacks. The other operative terms, *accumulation* [also undefined] and *trash* [defined] invest

no more certainty to the context than the ordinance conveys without them. It is the *unsightly* accumulation of trash the enactment regulates, and not merely the accumulation of trash. It remains a term without definition—and in the absence of definition or [as in *City of Collinsville v. Seiber,* 82 Ill.App.3d 719, 38 Ill.Dec. 75, 403 N.E.2d 90 (1980)] the aid of context—is too vague to be enforceable.

■ An average person presented with the terms of the ordinance and careful compliance will not understand from the text whether a proposed conduct will incur a penalty. "Ordinances should not be so worded as to leave their substantive elements to the caprices of either judge or jury." *Olympic Drive-In Theatre, Inc. v. City of Pagedale,* 441 S.W.2d 5, 8[1, 2] (Mo.1969). Such ordinances are void for vagueness and uncertainty. *Diemer v. Weiss,* 343 Mo. 626, 122 S.W.2d 922, 924[9] (banc 1938); *St. Louis County v. McBride & Son, Inc.,* supra, l.c. 879[1].

The judgment is reversed.

All concur.